UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SHEILA CLEVELAND, et al.,

        Plaintiffs,

    v.

UNITED STATES OF AMERICA,

        Defendant.

_____/

No. C 06-3853 PJH

**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS; GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

      On November 28, 2007, the court heard argument in defendant's motion to dismiss the above-entitled action for lack of subject matter jurisdiction and alternative motion for summary judgment, and plaintiffs' motion for partial summary judgment. Plaintiffs appeared by their counsel Michael S. Henderson, and defendant appeared by its counsel Katherine B. Dowling. Having read the parties' papers and carefully considered their arguments and the relevant legal authority, and good cause appearing, the court hereby GRANTS defendant's motion to dismiss; GRANTS defendant's alternative motion for summary judgment; and DENIES plaintiffs' motion.

## INTRODUCTION

      This is a case brought under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671, et seq., alleging willful failure to guard or warn against a dangerous condition or

United States District Court

For the Northern District of California

structure.  Plaintiffs are Sheila Cleveland, the widow of Dale Cleveland, and Chelsea Cleveland and Tyson Cleveland, the children of Dale Cleveland.

Dale Cleveland died from injuries he received in October 2003 when he drove his vehicle up and over an embankment and into the Union-Zaar mine shaft.[1]  The Union-Zaar mine shaft is an unmarked, abandoned vertical mine shaft located in the Smith River National Recreation Area ("SRNRA"), which is part of the Six Rivers National Forest in Del Norte County, California.  The Six Rivers National Forest falls under the jurisdiction of the United States Department of Agriculture (USDA) Forest Service ("the Forest Service").

The United States seeks an order dismissing the case for lack of subject matter jurisdiction, based on the "discretionary function" exception to the FTCA.  In the alternative, the United States seeks summary judgment on its third and eighth affirmative defenses, asserting that the doctrine of assumption of the risk precludes plaintiffs from establishing negligence, and that any failure to warn was not willful.

Plaintiffs seek summary judgment on the United States' ninth affirmative defense, asserting the discretionary function exception to the FTCA, on the ground that the exception does not apply in this case.

**BACKGROUND**

A.    Factual Background

On October 11, 2003, Dale Cleveland was "off-roading" (also referred to as "four-wheeling") with his adult son Tyson Cleveland and a group of friends in the SRNRA.  Dale Cleveland was driving his 1970 Toyota Landcruiser, and Tyson Cleveland was riding in the passenger seat.  The remaining members of the group were distributed among three other vehicles.

Late in the afternoon, the vehicles were traveling on Del Norte County Road 305, in the Altaville area of the SRNRA.  Dale Cleveland's vehicle was in the lead.  At one location, where County Road 305 passes across privately-owned land, two primitive dirt and gravel

---

[1]  The mine site is spelled "Union-Zaar" by the United States, and "Union-Zahr" by plaintiffs.

United States District Court

For the Northern District of California

trails lead off County Road 305 – one extending to the west, referred to by the parties herein as the "upper access route," and one (a little further south) extending to the southwest, referred to as the "lower access route."  The upper and lower access routes do not appear on the Forest Service's SRNRA map.[2]  Slightly north of the upper access route, and extending southeast off County Road 305, is another dirt and gravel trail, which is designated on the SRNRA map as an "OHV" (off-highway vehicle) route.

The vehicles turned off County Road 305 onto the dirt and gravel lower access route.  The lower access route is approximately 8.5 feet wide, with a surface consisting of rocks and boulders of varying sizes and shapes.  Approximately 1/2 mile down the lower access route is a fork in the road.  To the right, the trail inclines up a hill, where, in approximately 1/4 mile, it joins up with the upper access route, in effect making a loop that goes back to County Road 305.

When Dale Cleveland's vehicle reached the fork, he stopped to wait for the rest of the group to catch up.  In a declaration filed in support of plaintiffs' motion, Tyson Cleveland states, "After waiting a couple of minutes, we decided it would be fun to drive up the right fork of the road a little way to see where it went."  Dale Cleveland drove up about 100 feet, and then stopped.

According to Tyson Cleveland, Dale Cleveland then started to back up, having decided there was no good place to turn around.  At that point, the rest of the vehicles pulled up behind Dale Cleveland's vehicle. Dale Cleveland then resumed driving forward to look for a place to turn around.  He drove up the trail, to the place where it joined the upper access route.

At the point where the two trails joined, the Clevelands saw what Tyson Cleveland describes as "look[ing] like a turn out, leading up a short embankment to a plateau above the roadway."  Tyson Cleveland "thought this would be a good place to turn around," and

---

[2] The trails do appear on the U.S. Geological Survey ("USGS") topographic map for this area (High Divide Quadrangle, California-Oregon, 7.5 minute series), as "unimproved," and marked "4WD."

United States District Court

For the Northern District of California

1    also "thought it would be fun to drive up the embankment in the Land Cruiser."

2        Thus, rather than turning to the left along the relatively level intersecting upper

3    access route, Dale Cleveland made a 90-degree turn to the left, crossed the upper access

4    route at a perpendicular angle, and drove his vehicle straight up the steep embankment,

5    which extends upward at approximately a 48-degree angle.  The embankment is

6    approximately 10-12 feet wide, with two large rocks embedded roughly in the center.  The

7    vertical rise from the trail to the top of the embankment is approximately 8 feet.

8        According to Tyson Cleveland, his father drove up "with the engine idling" – a

9    manoeuver known as "crawling," in which the driver puts the vehicle in low gear and lets

10   the engine pull the vehicle along.  The vehicle's tires were "aired down," to "[p]robably like 5

11   pounds pressure in each tire, so basically flat, to where they're just wrapping around

12   everything, just grabbing on."

13       Dale Cleveland's friend Jerry Bachman was following the Cleveland vehicle, and

14   testified that Dale and Tyson Cleveland were looking back behind them and smiling as they

15   climbed up the embankment.  Tyson Cleveland testified that as the Land Cruiser climbed

16   the embankment, they could not see what was in front of them, and that neither he nor his

17   father stopped the vehicle to get out to see what was up at the top of the embankment.

18       At the top of the embankment, approximately 20 feet from its base at the side of the

19   trail, Dale Cleveland drove forward, whereupon the Land Cruiser plummeted straight down

20   into the Union-Zaar mine shaft.  The opening of the mine shaft is approximately 3-4 feet in

21   from the top of the embankment, and is approximately 12 feet in diameter.  The shaft itself

22   is approximately 70 feet deep.  At the time of the accident, the mine shaft was not fenced

23   off or enclosed, or signed or marked in any visible way.  Dale Cleveland was killed in the

24   crash, and Tyler Cleveland was seriously injured.

25       Tyson Cleveland testified in his deposition that Dale Cleveland had been drinking

26   alcohol the day of the accident.  Tyson Cleveland stated that he saw his father drink "a

27   beer" while they were waiting at the fork for the other vehicles to catch up.  He claimed that

28   Dale Cleveland was not drinking alcohol at any time while he was driving.  He did not know

United States District Court
For the Northern District of California

1  whether his father had more than the one beer.

2      A subsequent blood test indicated that Dale Cleveland had a .10 blood alcohol level,

3  although plaintiffs dispute the validity of the blood test.  Numerous beer cans and some

4  marijuana were recovered from the vehicle after the accident.  California Highway Patrol

5  Officer Rick Barry, who conducted the accident investigation, concluded that the cause of

6  the accident was that Cleveland was under the influence of alcohol, in violation of California

7  Vehicle Code § 23152(a).

8      Members of the party, including Tyson Cleveland, were aware that numerous

9  abandoned mines were located in the area where they were four-wheeling, and they were

10  headed to see some double-decker abandoned mine shafts the day of the accident.

11  However, Tyson Cleveland had never investigated the area where the October 11, 2003

12  accident occurred for possible hazards before riding there, and he did not believe his father

13  had ever driven in that area.

14      Tyson Cleveland also testified that he had not consulted the SRNRA visitor map,

15  which shows the designated Forest Service roads in the SRNRA, including the designated

16  OHV routes, and did not believe his father had.  In fact, Tyson Cleveland had never looked

17  at the SRNRA map prior to the accident.  He states in his declaration that he believed that

18  "we were allowed to 4-wheel on any road in the NRA that was not blocked off, gated or had

19  a sign stating that the road was not to be used."

20      He testified that "[w]e never carried a map with us" because "the adventure of four-

21  wheeling was just to go out and be on an adventure, not to look at the map and tell us

22  exactly where we are going.  We wanted to go out there and find new stuff."  He testified

23  that it was more fun off-roading on challenging terrain, and that "[s]ometimes it's scary . . .

24  [Y]ou don't know if you want to do that, but – you might roll or you – anything could happen,

25  so you've just got to be aware."

26      Tyson Cleveland admitted that going up the steep embankment would be

27  considered "hill climbing" or "rock crawling," and testified that he goes "hill climbing" every

28  time he goes OHV riding.  He testified that he and his father did not discuss whether to

5

1  climb the embankment, and that the decision to do so was his father's alone (although he

2  also states in his declaration that he thought the top of the embankment would be a good

3  place to turn around).

4  B.      The National Forest System

5        The National Forest System ("NFS") "consists of units of federally owned forest,

6  range, and related lands throughout the United States and its territories, united into a

7  nationally significant system dedicated to the long-term benefit for present and future

8  generations." 16 U.S.C. § 1609(a).  The National Forests were established and are

9  administered "for outdoor recreation, range, timber, watershed, and wildlife and fish

10  purposes."  16 U.S.C. § 528.

11        Congress has directed the Forest Service to balance a wide variety of competing

12  policy objectives in its administration of public lands.  The Forest Service administers and

13  manages the NFS lands in accordance with the Multiple-Use Sustained-Yield Act of June

14  12, 1960, 16 U.S.C. §§ 528-31; the Forest and Rangeland Renewable Resources Planning

15  Act of August 17, 1974, 16 U.S.C. §§ 1600-14; and the National Forest Management Act of

16  October 22, 1976, 16 U.S.C. §§ 472a, 476, 500, 513-16, 521b, 576b, 1600-02, 1604, 1606,

17  1608-14.  See 36 C.F.R. § 200.3(b)(2).

18        Under the  Multiple-Use Sustained Yield Act, the Forest Service is required to

19  consider the "best and most judicious means" of implementing its policy priorities, including

20  reforestation, fire prevention, preventing soil erosion, and preserving wildlife.  16 U.S.C.

21  §§ 531, 551, 581j, 583.  The Forest and Rangeland Renewable Resources Act and the

22  National Forest Management Act provide additional direction to the Forest Service in the

23  management of federal lands, and specifically require the Forest Service to consider the

24  economic and environmental impacts of actions.  Id. § 1600, et seq.

25  C.      Roads in the National Forest System and the Smith River National Recreation Area

26        The NFS has a nationwide forest transportation system.  The forest transportation

27  system was created in accordance with a mandate from Congress, which declared that

28        the construction and maintenance of an adequate system of roads and trails

United States District Court
For the Northern District of California

within and near the national forests and other lands administered by the Forest Service is essential if increasing demands for timber, recreation, and other uses of such lands are to be met . . . and that such a system is essential to enable the Secretary of Agriculture . . . to provide for intensive use, protection, development, and management of these lands under principles of multiple use and sustained yields of products and services.

16 U.S.C. § 532.

Through the NFS forest transportation system, the Forest Service manages the roads under its authority and control. These "Forest System roads" are also called "system roads." In addition, there are "Forest System trails" or "system trails" that are also part of the forest transportation system. The "system roads" and "system trails" are also referred to as "Forest System routes" or "system routes."[3]

Congress provides funds for road maintenance on NFS roads. Construction appropriations are generally used to maintain system roads and routes, in accordance with

———————————

[3] Current Forest Service regulations define "road" as "[a] motor vehicle route over 50 inches wide, unless identified and managed as a trail. 36 C.F.R. § 212.1 (2007). A "trail" is "[a] route 50 inches or less in width or a route over 50 inches wide that is identified and managed as a trail." Id. A "National Forest System road" is "[a] forest road other than a road which has been authorized by a legally documented right-of-way held by a State, county, or other public road authority. Id. A "National Forest System trail" is "[a] forest trail other than a trail which has been authorized by a legally documented right-of-way held by a State, county, or other local public road authority." Id. Prior to amendment of the Forest Service regulations in 2001, "Forest System roads" and "Forest System trails" were referred to as "Forest Development roads" and "Forest Development trails." See 66 FR 3206, 3212 (Jan. 12, 2001).

Forest Service regulations regarding travel management underwent a major revision in 2005, to clarify policy related to motor vehicle use, including the use of off-highway vehicles. See 70 FR 68264 (Nov. 9, 2005). Prior to this revision, the regulations governing roads and trails in the Forest System and the use of vehicles on such roads and trails appeared in scattered parts of C.F.R. Title 36.

Although neither the United States nor plaintiffs cite the regulations in effect as of October 2003, the court notes that at that time, "road" was defined as "[a] motor vehicle travelway over 50 inches wide, unless designated and managed as a trail." 36 C.F.R. § 212.1 (2003). Roads were either "classified" (including roads authorized and managed by the Forest Service), "unclassified" (including roads not authorized or managed as part of the NFS forest transportation system, and "off-road vehicle tracks that have not been designated and managed as a trail"), or "temporary" (roads authorized by contract or lease, not intended to be part of forest transportation system. Id. National Forest System "roads" and "trails" were "wholly or partly within or adjacent to and serving a part of the National Forest System and [were] included in a forest transportation atlas." 36 C.F.R. § 261.2 (2003). A "forest transportation atlas" was "[a]n inventory" of National Forest System roads and trails. 36 C.F.R. § 212.1 (2003).

1   the Forest Service Handbooks,[4] including the Service-Wide Appropriation Use Handbook,

2   FSM 6509.11g.

3        Numerous other routes, roads, and remnants of roads on NFS lands are not

4   managed by the Forest Service as part of its transportation system.  These are referred to

5   as "non-system roads" or "non-system routes."  There is no requirement that non-system

6   roads be gated or signed, and maintenance and signing of non-system roads is not an

7   authorized use of the funds appropriated for road maintenance in the NFS.

8        The Six Rivers National Forest includes the SRNRA, and the Orleans, Lower Trinity,

9   and Mad River Ranger Districts, and encompasses more than 957,000 National Forest

10  acres and 133,000 acres of other ownership.  The SRNRA – approximately 305,000 acres,

11  or 450 square miles, of the Smith River watershed in the Six Rivers National Forest – was

12  created in 1990 by Congressional enactment of the Smith River National Recreation Act,

13  P.L. 101-612, 104 Stat. 3209 (Nov. 16, 1990).

14       The stated purpose of the Smith River National Recreation Act is to "ensur[e] the

15  preservation, protection, enhancement, and interpretation for present and future

16  generations of the Smith River watershed's outstanding wild and scenic rivers, ecological

17  diversity, and recreation opportunities while providing for the wise use and sustained

18  productivity of its natural Resources."  16 U.S.C. § 460bbb-2(a).

19       The Land and Resource Management Plan for the Six Rivers National Forest (1995)

20  states that the primary management goals in the SRNRA are "to emphasize, protect, and

21  enhance the unique biological diversity; anadromous fisheries; and the wild, scenic, and

22

—————————————

23       [4]  The Forest Service Directive System consists of the Forest Service Manual ("FSM")

24  and Forest Service Handbooks ("FSH"), which codify Forest Service policy, practice, and
    procedure. The Directive System serves as the primary basis for the internal management and

25  control of all programs and the primary source of administrative direction to employees of the
    Forest Service.   The FSM contains legal authorities, objectives, policies, responsibilities,

26  instructions, and guidance needed on a continuing basis by Forest Service line officers and
    primary staff in more than one unit to plan and execute assigned programs and activities. The

27  FSH is the principal source of specialized guidance and instruction for carrying out the
    direction issued in the FSM. Specialists and technicians are the primary audience of Handbook

28  direction.  See http://www.fs.fed.us/im/directives/dughtml/overview.html.; see also 36 C.F.R.
    § 216.2.

United States District Court

For the Northern District of California

1    recreational potential of the Smith River while providing sustained yields of forest products."

2

3        The Smith River National Recreation Act directs the Secretary of Agriculture to

4    "[p]ermit the use of off-road vehicles only on designated routes."  Id. § 460bbb-3(a)(4); see

5    also H.R. Rep. 101-707 (Sep. 17, 1990).  Similarly, the Land and Resource Management

6    Plan provides that "OHV use is restricted to designated routes."  As of October 2003,

7    Forest Service regulations provided that "[r]oads, or segments thereof, may be restricted to

8    use by certain classes of vehicles or types of traffic," and "may be closed to all vehicle use"

9    as provided in 36 C.F.R. part 261 ("Prohibitions").  36 C.F.R. § 212.5(a) (2003).

10        In the SRNRA, the Forest Service informs the public which system roads or routes

11    are open to vehicular traffic, rather than indicating which non-system roads are closed to

12    vehicular traffic.  This is done primarily (though not solely) through the SRNRA visitor map,

13    which the public can obtain from the Six Rivers National Forest, at the Gasquet Ranger

14    District Office in Gasquet, California and at the Six Rivers National Forest Supervisor's

15    Office in Eureka, California.

16        The SRNRA visitor map, which is dated 1994, contains a legend that identifies the

17    highways and Forest System roads and trails in the SRNRA.[5]  By consulting the SRNRA

18    map, a member of the public can readily determine the quality of a particular route, and

19    whether a route is available for vehicular use.  There are 13 different types of system

20    routes identified in the SRNRA map legend – primary and secondary highways, scenic

21    byways, improved roads (paved, gravel, and dirt), unimproved roads (general and four-

22    wheel-drive-only recommended), designated OHV routes (general and motorcycle), and

23    three types of trails (including maintained and unmaintained).

24        The terms "designated routes" and "unimproved roads" are depicted in the map

25    legend.  Because both "designated routes" and "unimproved roads" appear on the map,

26    they are "system roads" and are therefore within the authority and control of the Forest

27    _____

28        [5]   The 1994 edition of the map was the version in use at the time of the accident in
     October 2003.

9

United States District Court

For the Northern District of California

1    Service.  The term "unimproved roads" has a specific symbol on the map and a meaning

2    specific to the Forest Service.

3       The back side of the SRNRA map includes a section entitled "Off-Highway Vehicle

4    Travel."  This section advises the reader,

> You can explore remote areas using your sport utility/four-wheel drive vehicle, trailbike, or all-terrain vehicle (ATV) on designated routes.  All unimproved roads are open to use unless otherwise signed or gated.  The key to responsible us[e] is remaining on designated roads and trails.  Do not cut switchbacks, take shortcuts, or travel cross-country.

8    As noted above, the terms "designated routes" and "unimproved roads" used in this section

9    are identified in the legend on the front side of the map, and the OHV trails are clearly

10    marked.  Thus, the map shows an OHV rider where he/she or she is allowed to use his/her

11    vehicle.

12       The Six Rivers National Forest also publishes a pamphlet entitled "OHV

13    Information."  The pamphlet states, "Forest policy states that the use of OHVs will be

14    restricted to designated routes (roads and trails) only.  There are no open areas in the

15    Forest."  The pamphlet states in addition that if, in the opinion of the Six Rivers National

16    Forest, it becomes necessary to temporarily close some of the <u>designated</u> routes, those

17    routes will be either gated or marked with signs.

18       There are no designated OHV routes, unimproved roads, or other system routes

19    shown on the SRNRA map that provide access to the Union-Zaar mine shaft.  Neither the

20    lower access route nor the upper access route is a designated road or route, and thus,

21    neither appears on the SRNRA map.

22    D.     The Forest Service Environmental Compliance and Protection and Abandoned

23         Land Mines Program

24       The Forest Service is divided into three levels – National, Regional, and Forest.  <u>See</u>

25    36 C.F.R. §§ 200.1, 200.2.  Nationwide policies and governance originate at the National

26    Level in Washington D.C. ("the Washington Office"), and are transmitted through the nine

27    Regional Levels to the Forests.

28       Thomas Buchta ("Buchta") has been a Forest Service employee for 29 years, and

1 since May of 2004 has served as the Abandoned Mine Land ("AML") and Reclamation

2 Program Leader in the Washington Office.  Prior to assuming that position, Buchta was the

3 Locatable Mineral Program Leader in the Regional Office of the Intermountain Region,

4 headquartered in Ogden, Utah, for 12 years.  Buchta is responsible for national AML

5 program development, for providing policy and program direction to the Regional Levels of

6 the Forest Service, and for the national AML budget.

7      In a declaration filed in support of the United States' motion, Buchta explains that the

8 Forest Service Environmental Compliance and Protection and Abandoned Land Mines

9 Program ("ECAP/AML") is the program through which the Forest Service manages the

10 inventory and cleanup of mine sites located on NFS lands.

11      Through this program, the Forest Service ensures that mine sites are in compliance

12 with federal environmental laws, including the Comprehensive Environmental Response,

13 Compensation and Liability Act of 1980, 42 U.S.C. §§ 9601, et seq. ("CERCLA"), and the

14 Resource Conservation and Recovery Act of 1976, 42 U.S.C. §§ 6901, et seq. ("RCRA").

15 Through ECAP/AML, the Forest Service also identifies and remediates mine sites that pose

16 a potential risk to public health and safety, including physical health and safety.

17      Buchta states that the Forest Service originally focused on CERCLA/RCRA projects

18 for which Congress had earmarked funding.  In the course of performing the environmental

19 inventory and cleanup, the Forest Service also identified physical hazards at the mine sites.

20 The Washington Office gave the Forest Service Regions and local Forests discretion to

21 determine how to conduct these inventories.

22      Janine Clayton ("Clayton") has been a Forest Service employee for 24 years.  She

23 currently serves as the Assistant Director of Minerals and Geology Management in the

24 Washington Office, and previously served from December 1997 to January 2006 as the

25 Regional AML Program Manager in the Pacific Southwest Region ("Region 5") in Vallejo,

26 California.  As Regional AML Program Manager, Clayton was responsible for regional

27 program development, providing technical direction to the Forests, and the regional AML

28 budget.

**United States District Court**

For the Northern District of California

In a declaration filed in support of the United States' motion, Clayton states that the Forest Service began receiving CERCLA/RCRA funds from Congress in the late 1980s, and that from 1985 to 1998, the Forest Service's use of the available CERCLA/RCRA funds was limited to addressing environmental concerns such as hazardous wastes and hazardous substances.  It was only after 1998 that any funds were available for physical safety hazard remediation programs.

Clayton explains that funds allocated to the Forest Service through the environmental remediation programs, and, in later years, through physical safety hazard remediation programs, were funneled through the Washington Office.  The staff of the Washington Office, in conjunction with representatives from the various Regions, determined how to allocate the funds among the Regions, which in turn allocated funds to the Forests for specific projects.

According to Buchta, in 1985, the USDA directed all agencies within the Department to conduct surveys to determine the extent of contaminated sites, including mine sites, needing corrective actions to comply with CERCLA/RCRA.  CERCLA was subsequently amended by the Superfund Amendments and Reauthorization Act of 1986, P.L. No. 99-499, 100 Stat. 1613 (1986), which expanded CERCLA requirements and required federal agencies to assess and clean up contaminated federal facilities.  Because the emphasis was on environmental concerns, identification of physical safety hazards was not an element of these surveys.

In 1988, the USDA established a hazardous material management fund ("Hazmat Fund") to identify sites needing cleanup in order to comply with CERCLA/RCRA.  Although the Hazmat Fund could not be used to mitigate physical safety hazards, because the monies were earmarked for CERCLA purposes, it could be used to inventory abandoned mines in addition to cleaning up hazardous sites.  In 1992, the Forest Service initiated an agency-wide inventory of abandoned mines using the Hazmat Fund.

Clayton explains that between 1991 and 1998, Region 5 Forests completed an AML inventory on a Forest-by-Forest basis.  Because the inventory was completed using

United States District Court

For the Northern District of California

CERCLA/RCRA funds, the primary focus was identifying hazardous-waste mine sites.  To the extent the surveyors observed any physical safety hazards, those hazards were noted in the inventory.  Clayton states that Region 5 did not issue specific mandatory guidance or instructions regarding how to complete the inventories, and there was no uniform Region-wide process.  The Forests exercised discretion in how they carried out the work.

Buchta states that Congress allocated funds to the Forest Service to be used for non-CERCLA cleanups and the mitigation of safety hazards for the first time in 1998.  In fiscal year 1998, the Forest Service began, for the first time, to receive approximately $5.0 million a year nationwide under the AML Initiative.  The funds from the AML Initiative were available to address physical safety hazards and were not limited to environmental clean-up projects.

Both Buchta and Clayton state that at the Washington Office's direction, most of this AML Initiative funding went to support the "pilot" watershed efforts in Regions 1 and 2 (Montana and Colorado).  However, Region 5 received $50,000 to begin program and partnership development in fiscal year 1998.

Clayton explains that while there was no nationwide policy regarding the allocation of those funds, a process was developed whereby projects were funded in order of priority, subject to the availability of funds.  The initial step was prioritizing projects in all nine Regions, with a subsequent prioritization at the National Level.  As AML Manager in Region 5, Clayton had the discretion to award funds for physical safety hazard projects in the manner she determined represented the best use of funds based on her analysis.

In anticipation of funds becoming available in Region 5, Clayton asked the Forests to submit proposals for projects they deemed important.  She states that this process typically involved a two-year funding cycle, in which the Forests would submit requests in January for funds coming two years later.

Apart from statutory limitations on the use of funds, and the requirement that Clayton's proposed allocations be approved by the Washington Office and her supervisor in Region 5, she had authority to allocate funds to proposed projects.  Thus, she had the

United States District Court

For the Northern District of California

1   discretion to allocate the $50,000 received by Region 5 in fiscal year 1998.

2       According to Clayton, she exercised her discretion by using those funds to help

3   create a statewide intergovernmental AML taskforce, which in turn began to create a

4   California state AML database.  This database included data on abandoned mines on

5   federal, state, and private lands throughout California.  According to Clayton, there was no

6   requirement that Region 5 participate in the statewide AML taskforce, or perform a regional

7   AML prioritization.  Region 5 participated in these efforts under Clayton's direction.

8       Clayton determined that the first step in the AML prioritization should be to review all

9   field inventory data submitted by the Forests and identify sites that had mine workings,

10  facilities, and excavations.  In December 1998, Region 5 produced an inventory entitled

11  "Prioritized Abandoned and Inactive Mine Sites."  The priority sites were categorized as

12  either "high" or "moderate" for potential CERCLA issues, hazardous mine openings, and

13  Clean Water Act issues.  The rest of the sites were considered, by default, low priority.

14      Factors affecting the ranking of the sites included proximity to water (naturally

15  occurring or developed for human use); chemicals used in mine workings (e.g., mercury or

16  cyanide); initial water quality tests that included pH and conductivity; proximity to human

17  exposure such as trails, recreation areas, towns, and residences; and the presence or

18  absence of mine features (openings, waste piles, high walls, or structures).  Seventy-one

19  hazardous mine openings in Region 5 were identified as "high" or "moderate" priority.

20      Clayton states that the Union-Zaar mine site was identified in the 1998 prioritization

21  list as a "moderate" priority in the CERCLA and Hazardous Mine Opening category.  The

22  Union-Zaar site was included because of water contamination as well as other potential

23  hazards.  According to Clayton, no shafts were located at the Union-Zaar mine site during

24  the 1998 inventory process.

25      Buchta states that from 1998 to 2005, a significant portion of the AML Program

26  funding was allocated to CERCLA and non-CERCLA cleanups.  Only in 2005 did the

27  priority shift to AML safety mitigation.  From 2005 to the present, the majority of the AML

28  Program budget of $5.0 million has been allocated to AML safety mitigation work.

United States District Court
For the Northern District of California

1    According to Buchta, the Washington Office works with the nine Regions to help

2    determine which projects at the local Forests should be given the highest priority for

3    receiving funds from the AML program.  In determining which local projects should be

4    funded first (given the limited resources available) the Forest Service generally focuses on

5    policy factors such as considerations of the severity of the hazard, the exposure and

6    access of the public, the safety of personnel, the feasibility of the project, and participation

7    by other partners.

8    Safety mitigation projects are selected, prioritized, and submitted by the nine

9    Regions to the Washington Office for funding.  Buchta asserts that there is no mandate that

10   the Forests submit any requests, and there is no required process for doing so.  Nor are

11   there any required national criteria or methodology that must be followed by the Regions in

12   selecting projects for submission to be funded.  In any given year, the availability of funding

13   limits the number of Regional priority projects that can be funded for that year.

14   E.    The Identification of the Hazard at the Union-Zaar Mine

15   Curtis Cross ("Cross") is a Forest Service employee who currently serves as a

16   Supervisory Civil Engineer in the Six Rivers National Forest, and is responsible for

17   management of the road system, facilities, drinking water systems, wastewater systems,

18   and other infrastructure in the Forest.  In addition to his other duties, Cross has served as

19   the Abandoned Mines Coordinator for the Six Rivers National Forest, and was assigned

20   that duty shortly after he joined the Forest Service in 2001.

21   In a declaration filed in support of the United States' motion, Cross states that as

22   Abandoned Mines Coordinator, he had the authority and discretion to shape the focus of

23   the AML program in the Six Rivers National Forest.  At the time he joined the Forest

24   Service in January 2001, the AML program was still primarily focused on environmental

25   concerns.  However, through the CERCLA remediation work, it had become clear that there

26   were also physical safety hazards at abandoned mines in the Six Rivers National Forest.

27   In early 2001, Cross began familiarizing himself with the mine sites located within

28   the Six Rivers National Forest.  As part of this process, he reviewed two earlier surveys

15

**United States District Court**
For the Northern District of California

1   prepared by the Forest Service – "Site Investigation of Abandoned Mines – Smith River

2   National Recreation Area – November 1991" ("1991 survey") and "Abandoned Mine Land

3   Inventory – Six Rivers National Forest – Fall 1998" ("1998 survey").

4       The 1991 survey was performed in order to identify environmental hazards.  The

5   survey reported eight abandoned mine sites, including the "Union Mine" (Union-Zaar mine),

6   located on the banks of Copper Creek in the SRNRA.

7       According to Cross, a mine "site" can cover a large area of land and may comprise

8   numerous mine "features," including "adits" (horizontal openings) and "shafts" (vertical

9   openings).  The 1991 survey indicated that the Union-Zaar mine "covers a disturbed area of

10   approximately 20 acres and is characterized by haul roads, adits, and associated takings

11   piles," having "5 adits located along the banks of the stream and 3 midslope adits located

12   100 to 300 feet above the stream channel."  Although the Union-Zaar mine shaft is a

13   feature of the Union-Zaar mine, it was not identified in the 1991 survey.

14       The 1998 survey was also performed primarily to identify environmental hazards,

15   although it addressed physical safety hazards as well.  The report identified 16 mine sites

16   as having medium to high priority for human safety hazards.  One of these was the Union-

17   Zaar mine, which was listed as having "[a]t least 5 adits near stream and 3 adits upslope" –

18   "[t]hree open adits and one caved adit near stream, and four other adits reported at stream

19   level and mid-slope."  Again, however, the Union-Zaar mine shaft was not identified in the

20   survey.

21       The report recommended further inspection of "adits for unsafe structures, bat

22   habitat, etc." and possible installation of "bat gates or other portal closures."  The report

23   also indicated that the "[o]pen adits are accessible and of uncertain length – could present

24   a significant physical hazard."  The area was described as "reasonably accessible to public

25   use," and was consequently given a physical hazard priority of "high."

26       In February 2001, Cross contacted the Region 5 Office in Vallejo, California, to

27   inquire generally about funding mechanisms and processes that were available to deal with

28   the physical safety hazards identified in the surveys.  He learned that funding for AML

programs is largely obtained at the National Level, and that the funding cycle is approximately a two-year process.  Region 5 informed Cross that the funding cycle process for 2001 (for fiscal year 2003 funding) was already complete, and that the next possible year to obtain funding was in the 2002 funding cycle (for fiscal year 2004 funding).

In April 2001, Cross decided to visit some of the abandoned mine sites that were listed on the 1998 survey, including the Union-Zaar mine site.  During the course of that visit, Cross located the mine shaft that is the subject of this litigation.  He took a photograph, which shows the opening of a vertical shaft with an old wooden plank or log resting across it.

In December 2001, Six Rivers National Forest received the 2002 annual call letter from Region 5 for AML project proposals for fiscal year 2004.  The due date for the proposals was January 24, 2002.  On January 7, 2002, Cross e-mailed Clayton at the Region 5 Office with questions regarding funding.  In his request, he indicated that the Six Rivers National Forest was interested in closing some shafts and adits at the Union-Zaar mine site.

Cross stated that the Union-Zaar shaft "poses the highest safety risk of all structures observed during the investigation since it is not fenced, marked, or filled with water."  He added that "[t]he shaft is located next to a popular off-highway vehicle trail and is not readily visible."[6]  He also identified some environmental concerns, and proposed "gating 2 adits, screening 2 adits and removing waste rock from the creek to be dumped down the nearest shaft."  He asked Clayton whether he should submit a proposal for a review under the National Environmental Policy Act (NEPA) before requesting funds to do the construction work, and asked her opinion regarding how to proceed and whether the project had any chance of getting funded.

Clayton asserts that Region 5 was not aware of the Union-Zaar mine shaft that is the

---

[6] In his second declaration submitted in support of the United States' reply brief, Cross clarifies that with the experience he has gained in the years since he started working in the SRNRA, he would not now consider the Union-Zaar mine shaft to be "near" popular OHV trails, because OHV use in the immediate area is not permitted.

United States District Court

For the Northern District of California

United States District Court
For the Northern District of California

subject of this litigation at the time the 1991 and 1998 inventories were completed.  She contends that the first notice that the Region 5 Office received of the existence of the Union-Zaar shaft was in Cross' January 2002 e-mail, which preceded his project proposal and request for funding for fiscal year 2004.

Cross testified in his deposition that he had located some indications in Forest Service records that the Union-Zaar mine shaft may have been discovered in the 1970s. He stated that he had obtained a document from that earlier period in 2005 or 2006.  The document had been sent from a company – possibly the California Nickel Corporation ("Cal Nickel") – that previously owned mine claims in the area, and it indicated that a Forest Service employee had instructed the company to put a fence around a shaft at the Union-Zaar site.  By the time that Cross came across the Union-Zaar mine shaft thirty years later, however, there was no intact fencing.

On January 22, 2002, Cross submitted a formal proposal to Region 5, seeking funding for fiscal year 2004, to address potential CERCLA remedial activities and safety issues associated with the Union-Zaar mine site, including the Union-Zaar mine shaft.  He stated that the Union-Zaar mine shaft "is located along abandoned roads that are currently used by OHV recreators."

Cross requested funding to close the adits and mine shaft, cautioning that "Forest liabilities associated with the open shafts and adits will continue to be high" if the project is delayed.  He estimated that approximately 30 people per year visited the site, "using the trails for OHV use," and described the major recreational activity there as "driving/viewing scenery."

Cross rated the "Unit Priority" for the Union-Zaar mine as "1," and explained in his deposition that "Unit Priority" referred to the local, or Forest priority – i.e., the priority placed on the project by Six Rivers National Forest.  Cross stated further in the proposal,

> Open shafts and adits present a hazard to OHV recreational activities in the area.  Tourists using the county road near the site could stop to investigate the open shaft with an easy view of the road and inadvertently fall in.  The [Union-Zaar] shaft on the unofficial OHV trail is not easily seen from the main trail.  The shaft is on a rise that appears to be a road pullout. If the rise were

18

used as a pullout, the ATV and rider could easily fall into the open shaft. There is currently no fencing, cover, of [sic] signing at the shaft openings.

The proposal requested $100,000 in funding, and explained the anticipated phases of the closure and remediation project.

Cross states that he determined, after reviewing the 1991 and 1998 surveys and visiting the site, that it was appropriate and beneficial to request funding for permanent closure. He concluded that while the mine shaft was located in a remote area which is not part of the designated OHV trail system in the Six Rivers National Forest, it was possible that some vehicles or pedestrians might attempt to access the site. However, he did not anticipate that a larger vehicle such as a Jeep, a Land Cruiser, or a truck would be able to reach the mine shaft, given its location at the top of a steep embankment.

In addition to applying for funds from the Washington Office for permanent closure of mine shafts, Six Rivers National Forest also had the discretion to use its local level appropriated funds to address a potential safety hazard such as the Union-Zaar mine shaft. However, according to Cross, larger projects such as permanent closure require National funds because this level of funding is not available at the local level.

In February 2002, according to Clayton, Region 5 completed gathering all the funding proposals received from the Forests in the Region, and prioritized the proposed projects in an effort to determine which should be funded for fiscal year 2004. Clayton performed the prioritization in conjunction with the Regional Environmental Engineer and his assistant. Clayton considered physical safety hazard concerns as well as environmental concerns.

On February 25, 2002, based on Cross' project proposal, Clayton selected the Union-Zaar mine shaft closure work for funding in fiscal year 2004. Region 5 submitted a General Project Information document concerning the Union-Zaar mine site to the Washington Office. This document contained language taken from Cross' proposal, regarding the risk to human health and safety posed by the shafts and adits. The Union-Zaar proposal was rated 10th in priority by Region 5, based on the CERCLA component.

19

United States District Court
For the Northern District of California

1    In June 2002, Cross contacted his supervisor Edward Zangger ("Zangger"), who was

2    the Forest Engineer Staff Officer for the Six Rivers National Forest, and also contacted

3    Forest Service Assistant District Fire Management Officer Synthia Heidt Zerr.  Cross

4    advised them that the Six Rivers National Forest had located some mine shafts in close

5    proximity to some roads.  He requested the assistance of fire personnel to provide labor to

6    build temporary fences around the mine shafts.

7    Cross states that in October 2002, after the fire season was over, Six Rivers

8    National Forest fire personnel fenced and signed the Union-Zaar mine shaft, as well as

9    another mine shaft located near County Road 305.  Constructing what is referred to as a

10   "gabion" fencing structure, the fire personnel placed heavy gauge wire baskets around the

11   mine shafts and filled them with rock.  Smooth wire was strung between the baskets to

12   encircle the shafts.  An "Abandoned Mine" land warning sign was placed on the wire to

13   warn of the presence of the shafts, and bright pink ribbon was wrapped between the rows

14   of smooth wire in order to increase visibility.

15   Cross states that he made the decision to put up the gabion fencing around the

16   Union-Zaar mine shaft as an interim measure until the funding, investigation, and

17   assessment process for permanent closure could be completed.[7]  He determined that

18   gabion fencing was the best means of fencing the mine shaft at that point, because it would

19   be more visible to the public and more easily constructed.

20   As the ground around the mine shaft was primarily bedrock and cobbles, Cross did

21   not believe that fence posts could be easily pounded into the ground at that location.  He

22   testified in his deposition that he "wasn't real confident that we would get the posts into the

23   hole," and was concerned that "it could create a hazard that someone could lean against it,

24

25   ──────────────────

     [7]  Cross explains that the funding proposal is only the first step in the process.  Once
26   funding is approved and obtained for permanent closure of a mine feature such as the Union-
     Zaar Mine shaft, the Six Rivers National Forest must also perform biological and archeological
27   assessments pursuant to NEPA to identify possible environmental impacts, and must also
     assess and design the best structure to close the feature, taking into account the impacts on
28   the environment, wildlife, cultural items, safety of the public and Forest Service personnel,
     cost, and feasibility and permanence of the closure.

United States District Court

For the Northern District of California

1  thinking it was more stable than it actually was and thereby create more of a hazard."

2      In addition, Cross determined there would be less impact on wildlife, less noise,  and

3  less disturbance of the ground using this method.  He testified that "the intent was really to

4  have something to hold up and warn the public, hold up the signs, something to put the

5  signs on, and the gabions were more visible than the narrow fence post."  In addition, the

6  Forest Service could more easily re-use the materials once a substantial permanent

7  enclosure had been constructed.

8      Other factors Cross considered were the cost of the project, the feasibility of closure,

9  the speed of completion, and the difficulty of getting construction equipment to the site.  He

10  evaluated various fencing options, and presented those options to Zangger, the Forest

11  Engineer, who had the discretion to determine what method was used.  Cross states that

12  he was not aware of any regulations mandating that a particular type of fencing be used to

13  enclose a mine shaft.

14      In February or March of 2003, Officer Steven White, who had heard about the

15  Union-Zaar mine shaft from a local resident, went looking for it, out of curiosity.  He testified

16  in his deposition that when he located the shaft, there were no gabion structures or fencing,

17  and no warning signs at the site.  He was unaware that the Forest Service considered the

18  site to be a public safety hazard, and in fact, believed at the time that the mine shaft was on

19  private land.  He testified that if he had known that the mine shaft was on NFS land, and if

20  he had known that the Forest Service had previously erected the gabion fencing, he

21  probably would have reported the lack of fencing and signage to the Six Rivers National

22  Forest.

23      However, Officer White added that while he believed that "structured shafts . . .

24  associated with old mining sites are in general terms hazardous," he did not feel that the

25  Union-Zaar mine shaft "was particularly more noteworthy than any number of other places

26  that are perhaps not man-made, but that exist out in the national forest."  He stated that he

27  had never heard a single report of anyone having been hurt in a mining structure in Del

28  Norte County.

United States District Court

For the Northern District of California

1    Moreover, it did not seem to him that a reasonable person would encounter a

2  problem at the Union-Zaar mine shaft.  He stated, "I did not foresee, not in my wildest

3  dreams, that someone would try to take a Jeep-type vehicle up there where you cannot see

4  anything in front of you but your hood pointed way up in the air.  I did not foresee, couldn't

5  imagine that somebody would do that without getting out first and looking to see where they

6  are going to drive."

7    During the rescue and recovery at the mine shaft following the October 2003

8  accident, Officer White noticed evidence of remnants of wire used to encircle the shaft at

9  some earlier period of time, prior to the time the gabion fencing was constructed, and

10  observed signs that the wire had been cut.  He also noted that it appeared that three of the

11  gabions had been vandalized and pushed into the open mine shaft.

12    Cross states that he was not aware of any requirement that the Six Rivers National

13  Forest regularly check or monitor the fencing at the mine shaft.  He asserts that the Six

14  Rivers National Forest has limited personnel and resources to devote to the AML program,

15  and that he felt that rather than spend resources on constant monitoring of the fencing at

16  the Union-Zaar mine shaft, AML program resources should be directed toward conducting

17  additional review of other mine sites and developing priorities for upcoming funding

18  requests.

19    Cross notes that the 1998 survey had identified 189 mine sites in the Six Rivers

20  National Forest, and that he had not inspected all of them.  He states that as the highest

21  density of identified mine sites is in the general area where the Union-Zaar mine site is

22  located, he anticipated returning to the area at some time in the future to check the site.

23  Based on this plan, based on the fact that funding had been requested for permanent

24  closure, and also based on the fact that the mine was located in a remote location where

25  there had been no prior mine accidents, Cross did not feel the need to request additional

26  personnel to check on the gabion structures at the Union-Zaar mine shaft.

27    Zangger testified that, based on the presence of the plank stretched across the

28  opening of the Union-Zaar mine shaft, his main concern was that people had been repelling

22

United States District Court

For the Northern District of California

1    down the inside of the shaft.  He stated that "[t]he fence was prioritized on my part to try to

2    keep people from going up there, walking up that 40-whatever-8 degree slope or whatever

3    it was to go up there."  He added that "there [were] no vehicle tire marks up there, but the

4    idea was to keep people on foot and warn them on foot when they walked up there to keep

5    away from the edge and not to be repelling into this shaft."

6         Once the funding had been appropriated for the interim fencing, Zangger verified

7    that the project had been completed, but did not see any subsequent need to direct that the

8    fencing and signage be monitored.  He stated that there had not previously been any

9    issues or problems associated with the Union-Zaar mine shaft, and "I did not see that there

10   was a risk identified because these things had existed since I don't know how long, and we

11   were doing this as a precautionary measure subsequent to their discovery."

12        In January 2003, the Six Rivers National Forest received the annual call letter for

13   AML safety closure projects to be funded in fiscal year 2005.  In February 2003, Cross

14   submitted proposals for safety closure work at the Union-Zaar mine site and for shafts/pits

15   along Hurdy Gurdy Creek.  The 2003 submittal process was different from the process the

16   previous year in that safety closure project proposals were to be submitted separately from

17   proposals for clean-up of environmental hazards.  According to Cross, this change reflected

18   the increased emphasis on physical safety hazards across Region 5 and at the Washington

19   Level.

20        Cross anticipated that different criteria were going to be used to rank safety closure

21   projects through this new process.  In addition, the Six Rivers National Forest had not yet

22   received verification that the safety issues identified in the 2002 proposal (for fiscal year

23   2004) had been approved.  Thus, in order to maximize the chance that the project would be

24   funded, Cross resubmitted the proposed safety closure work for the Union-Zaar mine shaft.

25        In this 2003 proposal, however, Cross prioritized the Union-Zaar mine shaft project

26   as second in importance, after the Hurdy Gurdy Creek project.  He did this because he had

27   been informed by district personnel that they had received complaints from members of the

28   public about the potential hazards near the Hurdy Gurdy area (which was located within

United States District Court

For the Northern District of California

one mile of a campground).  Increased recreational development was also planned for the Hurdy Gurdy area.  By contrast, the Union-Zaar mine shaft was located in a remote area where motor vehicle use was not permitted, and the Six Rivers National Forest had no record of having received any public complaints about the Union-Zaar mine shaft.  Having determined that the proximity to recreation areas and access opportunities represented a higher risk to the public, Cross therefore identified the Hurdy Gurdy project as having a higher priority.

On July 30, 2003, Cross received an e-mail from Clayton, confirming that Six Rivers National Forest would receive $30,000 in fiscal year 2004 for AML safety closures, and a total of $125,000 in fiscal year 2005 for AML safety closures (including $70,000 for Hurdy Gurdy and $55,000 for Union-Zaar).

F.     Events Occurring Eight Months Prior to the October 2003 Accident

On February 2, 2003, Officer Steven White stopped a group of four OHVs, which he had observed stopped at the intersection of a primitive, non-system vehicle route and U.S. Forest System route 17N49/Gasquet Mt. Road, approximately three miles from the site where the October 11, 2003, accident would later occur.  Dale Cleveland and Tyson Cleveland were among the OHV riders in this group, which also included Sheila Cleveland, Jerry Bachman, Tana Bachman, and Curtis Johnson.

Officer White determined that all four vehicles had exited the non-system route; that some had driven around a two-foot-tall rock barrier device placed across the primitive trail; and the vehicle driven by Dale Cleveland had been driven over the rock barricade rather than around it.  Officer White warned the group that they were in violation of Forest Service regulations by driving on a route not designated for motor vehicles.  His contact with the group lasted approximately 45 minutes.  He spoke directly to Dale Cleveland and Jerry Bachman about where they were and were not permitted to operate their vehicles.

Jerry Bachman testified in his deposition that he and Dale Cleveland told Officer White that they had grown up in the area and had for many years been driving on the old roads in the Six Rivers National Forest.  Bachman stated that in his opinion, all the roads,

trails, and paths in the SRNRA should be open access for OHV or four-wheel driving, and that it was "not right" for the Forest Service to shut so many roads "by putting gates on them," because "[i]t's our land, and we should be able to go anywhere we want on it."

Officer White asserts that he advised that Dale Cleveland would be cited in the future for "hill climbs" or attempts to climb steep slopes, and that he provided Jerry Bachman and Dale Cleveland with handouts on OHV operations.  The handouts stated that OHV use was restricted to designated routes only.  Officer White states that he informed Jerry Bachman and Dale Cleveland that they should consult the SRNRA map, which shows the designated OHV roads and trails, and that they could also ask at the Gasquet Ranger Station.

Jerry Bachman, who had been drinking the day of the incident, testified that he did not recall receiving any OHV handouts or being told that he should consult the SRNRA map.  Tyler Cleveland, who overheard at least part of the discussion between Officer White, Dale Cleveland, and Jerry Bachman, also claims not to recall seeing Officer White give anyone an OHV handout.

Sheila Cleveland, Dale Cleveland's wife, states in a declaration filed in opposition to the United States' motion that she did not see Officer White give anyone the OHV pamphlets, and that Officer White did not tell them they were supposed to drive only on roads that showed on the SRNRA map.  She also claims that Officer White told them only that they were not to drive on areas that were clearly not existing roads or four-wheel-drive trails, or on roads or trails that had been blocked off or had signs indicating that driving was prohibited.

**DISCUSSION**

A.     The FTCA and the Discretionary Function Exception

The United States "can be sued only to the extent that it has waived its immunity." United States v. Orleans, 425 U.S. 807, 814 (1976).  "[T]he terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit."  United States v. Mitchell, 445 U.S. 535, 538 (1980) (citation and quotation omitted).  The FTCA waives the sovereign

United States District Court
For the Northern District of California

1   immunity of the United States for certain torts committed by federal government employees

2   where a claim would exist under state law if the government were a private party.  28

3   U.S.C. § 1346(b).

4        This waiver of sovereign immunity is limited by certain statutory exceptions.  One

5   such exception, the "discretionary function" exception, provides that no liability shall lie for

6   claims "based upon the exercise or performance or the failure to exercise or perform a

7   discretionary function or duty on the part of a federal agency or an employee of the

8   Government, whether or not the discretion involved be abused."  28 U.S.C. § 2680(a).

9        This exception "restores the government's immunity in situations where its

10  employees are carrying out governmental or regulatory duties."  Blackburn v. United States,

11  100 F.3d 1426, 1429 (9th Cir. 1996) (citations and quotation omitted).  The purpose of the

12  exception is to "prevent judicial 'second-guessing' of legislative and administrative

13  decisions grounded in social, economic, and political policy."  United States v. Gaubert, 499

14  U.S. 315, 323 (1991) (citation and quotation omitted).

15       To determine whether the challenged conduct falls within the discretionary function

16  exception, courts employ a two-step analysis.  Berkovitz v. United States, 486 U.S. 531,

17  536-37 (1988).  First, the court must first ask whether the challenged action "is a matter of

18  choice for the acting employee."  Id. at 536; see also Whisnant v. United States, 400 F.3d

19  1177, 1180-81 (9th Cir. 2005).  "The exception does not apply 'when a federal statute,

20  regulation, or policy specifically prescribes a course of action for the employee to follow'

21  and the government employee deviates from this course."  Navarette v. United States, 500

22  F.3d 914, 916 (9th Cir. 2007) (quoting Berkovitz, 486 U.S. at 536).

23       Second, if the court finds that the challenged conduct involves an element of

24  judgment, it must determine whether that judgment is of the type that Congress intended to

25  protect – that is, whether the action or decision is susceptible to social, economic, or

26  political policy analysis.  Berkovitz, 486 U.S. at 536-37; Whisnant, 400 F.3d at 1181.  If the

27  challenged action is both discretionary and policy-driven, the discretionary function

28  exception bars the FTCA claims.  Oberson v. United States Department of Agriculture,

1   Forest Service, 441 F.3d 703, 710 (9th Cir. 2006).

2       In considering whether the discretionary function exception applies, the court must

3   consider the allegations of the complaint.  Because the FTCA premises liability on the "law

4   of the place where the action or omission occurred," 28 U.S.C. § 1346(b), California tort law

5   governs plaintiffs' claims.  See Yanez v. United States, 63 F.3d 870, 872 (9th Cir. 1995).  In

6   the present complaint, plaintiffs allege a single cause of action – a claim of willful or

7   malicious failure to guard or warn against a dangerous condition or structure, under

8   California Civil Code § 846.

9   B.      Motion to Dismiss for Lack of Subject Matter Jurisdiction

10      A motion to dismiss on the basis of the discretionary function exception to the FTCA

11  is treated as a motion to dismiss for lack of subject matter jurisdiction pursuant to Federal

12  Rule of Civil Procedure 12(b)(1).  McCarthy v. United States, 850 F.2d 558, 560 (9th Cir.

13  1988).  The burden of establishing subject matter jurisdiction ordinarily rests upon the party

14  asserting jurisdiction.  Kokkonen v. Guardian Life Ins. Co. of America, 511 U.S. 375, 377

15  (1994).  In an FTCA case, however, the United States bears the burden of demonstrating

16  that the discretionary function exception applies.  Whisnant, 400 F.3d at 1181.

17      The United States contends that the determination of how to identify and warn of the

18  potential hazard posed by the Union-Zaar mine shaft, and whether and how to warn of the

19  hazard, was a discretionary act and a policy judgment.  Plaintiffs argue that it was neither

20  discretionary, nor a judgment of the kind that the discretionary function exception was

21  designed to shield.

22      1.      The Element of Discretion

23      The court must first determine whether the Forest Service's decisions regarding how

24  to identify and warn of the potential hazards of the Union-Zaar mine shaft were a matter of

25  judgment or choice.  Because the Forest Service did not mandate specific safety actions

26  that Forest Service employees could or could not take, the decision whether to erect

27  fencing around the Union-Zaar mine shaft and decision whether to post warning signs was

28  discretionary, as was Cross' decision to submit a funding request in January 2002 for

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1   closure of the mine shaft,.

2       In Berkovitz, the Supreme Court held that the discretionary function exception does

3   not apply "when a federal statute, regulation, or policy specifically prescribes a course of

4   action for the employee to follow" because in that event, "the employee has no rightful

5   option but to adhere to the directive." Berkovitz, 486 U.S. at 536.  The plaintiff in Berkovitz

6   had contracted polio after taking an oral polio vaccine, and sued the United States for

7   approving production and distribution of the vaccine.

8       The court held that the decision by the National Institutes of Health's Division of

9   Biologic Standards to license the vaccine without first receiving the required safety data

10  from the manufacturer was not protected by the discretionary function exception, because

11  federal statutes and regulations mandated that licenses for vaccines could be issued only

12  upon a showing that the vaccines met specific safety standards.  Id. at 540-42.  Thus, the

13  United States had no discretion to issue the license without first receiving the required test

14  data.  Id. at 542-43.

15      Here, by contrast, there is no evidence of any statutory or regulatory mandate that

16  required the Six Rivers National Forest to make a search of Forest Service lands to identify

17  all possible hazards, to engage in the process of identifying and seeking funding for

18  permanent closure of possible safety hazards, or to install fencing around mine features

19  slated for permanent closure.

20      Plaintiffs appear to concede that the above-described actions were not governed by

21  any statutory or regulatory mandate, and that some discretion existed at the Regional or

22  Forest Level with regard to determining which abandoned mine features posed a hazard to

23  the public.  They contend, however, that having determined that the Union-Zaar mine shaft

24  was potentially hazardous to the public, the Forest Service was obligated by certain

25  "policies" to erect and maintain warning signs, and to erect a gate or sign across the trails

26  that led to the mine shaft.

27      First, plaintiffs assert that because the Forest Service, acting through Cross, had

28  identified the Union-Zaar mine shaft in the January 2002 project proposal for fiscal year

United States District Court

For the Northern District of California

2004 as its "number one priority" in the Six Rivers National Forest, the Forest Service had no discretion in deciding whether to erect and maintain mine hazard warning signs at the Union-Zaar mine shaft.

Second, plaintiffs contend that the Forest Service Health and Safety Code Handbook includes policy background applicable to the question of abandoned mines, and that § 22.81d(9) of the Forest Service Health and Safety Code specifically mandates that warning signs be placed on abandoned mines.[8]

Third, plaintiffs argue that the Forest Service was obligated to erect gates across the upper and lower access routes leading to the Union-Zaar mine shaft, or to place signs on those trails because the Forest Service had established a "plan and policy" by stating in the SRNRA map that "all unimproved roads are open to use unless otherwise signed or gated." Plaintiffs contend that in publishing this statement, the Forest Service committed to gate off or sign off any unimproved road in the SRNRA that was not open to OHV use.

The court finds that none of these "policies" imposed a general mandatory duty on the Forest Service with regard to warning of the hazards of the Union-Zaar mine shaft. With regard to Cross' determination that the Union-Zaar mine shaft was potentially hazardous and his recommendation that some sort of permanent closure be effected, the court notes that it is undisputed that the Forest Service posted warning signs and installed gabion fencing as an interim measure, and that Region 5 submitted an application to the Washington Office for funding for a permanent closure.

Plaintiffs acknowledge that the Forest Service installed interim fencing and warning signs at the mine shaft, but assert that the Forest Service was at fault because it did nothing to maintain the signs, and in fact ignored evidence that the signs had been

---

[8] The Forest Service's Health & Safety Code Handbook, FSH 6709.11, is part of the Forest Service Handbook, available at www.fs.fed.us/im/directives/fsh/6709.11/FSH6709.pdf. See also http://www.fs.fed.us/im/directives/dughtml/fsh6000.html. (Health and Safety Code Handbook is part of Forest Service's Safety and Health Program).

United States District Court

For the Northern District of California

1   displaced or removed.[9]  Plaintiffs claim that once the Forest Service had erected the

2   fencing and signs, it had no discretion with regard to whether they should be monitored.

3        However, there are no Forest Service mandates or requirements that interim gabion

4   fencing be monitored.  Because Six Rivers National Forest was engaged in the process of

5   implementing its discretionary decision to seek approval and funding for a permanent

6   closure of the mine shaft, and because the mine shaft was located in a remote area that

7   was not accessible by any designated Forest Service road, neither Cross nor Zangger

8   requested regularly scheduled monitoring or assumed that such monitoring would occur.

9   Just as it was within the discretion of the Forest Service to erect the interim fencing and

10  warning signs, and to submit the application for funding for a permanent closure, it was also

11  within the Forest Service's discretion to determine what, if any, monitoring should be done

12  in the area.

13       The court also finds that Health and Safety Code § 22.81d(9) did not compel the

14  Forest Service to place warning signs on the mine shaft.  The Forest Service Health and

15  Safety Code Handbook is "the primary source of standards for safe and healthful workplace

16  conditions, project inspections, and operational procedures and practices in the Forest

17  Service," and is intended to supplement the standards and regulations of the Occupational

18  Safety and Health Administration.  U.S. Dep't of Agriculture, Forest Service, FSH 6709.11,

19  Health and Safety Code Handbook, at 0-3.

20       Among other things, the Health and Safety Code Handbook sets forth procedures to

21  be followed by Forest Service employees when conducting mine safety assessments.  In

22  addition to meeting the applicable training and certification requirements, qualified

23  employees who assess mine safety are required to follow certain procedures, which include

24  the posting of an Abandoned Mine Hazards Poster in "a conspicuous place near the

25

26  _____

27       [9]  Plaintiffs do not claim that any Forest Service employee was aware that the gabion
    fencing and signs at the Union-Zaar mine shaft had been torn down.  Rather, they suggest that
    the Forest Service should have been on inquiry notice regarding the possible destruction of
28  the fencing and signs at the Union-Zaar Mine shaft, based on the fact that the fencing and
    signs erected at another mine shaft near County Road 305 had been damaged or removed.

United States District Court

For the Northern District of California

1   entrance of known abandoned/inactive underground mine openings."  Id., §§ 22.81b,

2   22.81d, at 20-73 to 20-76.

3        The Health and Safety Code Handbook is plainly not a safety plan directed at

4   protecting the safety of the general public, as it largely concerns Forest Service employee

5   safety.  By its terms, § 22.81d simply provides general guidance regarding mine

6   assessments conducted by Forest Service employees.  While it is true that § 22.81d(9)

7   provides the only regulatory guidance to the Forest Service regarding abandoned mine

8   signing, it states only that Forests should "[d]isplay the Abandoned Mine Hazards Poster in

9   a conspicuous place near the entrance of known abandoned/inactive underground mine

10  openings," as part of mine assessments.

11       Buchta recalls that the Abandoned Mine Hazards sign was originally developed in

12  the early 1990s.  He testified that he had seen a letter from the Washington Office to the

13  Regional Foresters announcing the availability of the sign in 1990, and had also seen a

14  series of subsequent letters from the Washington Office asking the Regional Offices to use

15  the signs to warn the public of abandoned mine hazards.  Some of those letters talked

16  about prioritizing mine sites, and listed various factors that should be considered as part of

17  that process.  These factors included the severity of the hazard, the exposure to the public,

18  whether or not there had been a prior incident or a complaint by the public, and the cost.

19       Clayton states in her declaration that while there was no mandatory process for

20  determining how and where mine hazard signs should be posted, Region 5 has taken an

21  active role in encouraging the Forests to post hazard warning signs at identified abandoned

22  mine sites that post safety risks to the public and to Forest Service employees.  As part of

23  that effort, Region 5 informed the Forests of the availability of mine hazard signs that could

24  be ordered and placed at hazardous mine openings.  Clayton adds that at annual regional

25  meetings of Forest Hazmat and AML Coordinators, she reminded the Forest Service

26  employees that the signs were available, and she coordinated group orders of signs from

27  the supplier.

28       Cross states in his declaration that he was aware that Forest Service Health and

31

1   Safety Code § 22.81d(9) required that an Abandoned Mine Hazards poster be placed "in a

2   conspicuous place near the entrance of known abandoned/inactive underground mine

3   openings."  He notes, however, that the Handbook provides no specific guidance or

4   instruction as to how or where an Abandoned Mine Hazards sign should be installed, and

5   the terms "conspicuous" and "entrance" are not defined.

6         A safety standard operates to remove discretion under the first prong of the

7   discretionary function test only when such standard is "embodied in a <u>specific</u> and

8   <u>mandatory</u> regulation or statute which creates clear duties incumbent upon the

9   governmental actors."  <u>Kennewick Irrigation Dist. v. United States</u>, 880 F.2d 1018, 1026

10  (9th Cir. 1989).  Here, in the absence of a specific, mandatory duty to warn the public about

11  any and all abandoned mines in the Six Rivers National Forest, Forest Service personnel

12  had the discretion to have the signs placed on the gabion structures installed around the

13  Union-Zaar mine shaft and the County Road 305 mine shaft, and the discretion to

14  determine how to monitor any installed signs.

15        In addition, the evidence shows that gating was not an option for interim closure.

16  Cross explains that the Six Rivers National Forest could not have legally placed gates to

17  bar entry to the upper and lower access routes, which Dale Cleveland and the drivers of the

18  other vehicles used to access the Union-Zaar mine site on October 11, 2003, because the

19  land was privately owned.  He adds that the installation of gates at the boundary of the

20  Forest Service lands would have created additional hazards, as there would have been no

21  room at that point for a vehicle to turn around safely.

22        Cross also states that he is unaware of any Forest Service regulation or policy

23  requiring that the Forest Service place gates on these types of roads, and states that, in

24  any event, it is his experience that OHV drivers often just drive around gates, or even pull

25  them down.  He also considers that in view of resource constraints, and aesthetic and

26  environmental concerns, it is generally unrealistic to expect that the Forest Service could

27  gate or sign every path or trail on NFS lands that could be interpreted as a route exiting a

28  system road.  He contends that this practice would result in hundreds if not thousands of

32

United States District Court

For the Northern District of California

1   additional gates or signs requiring installation and maintenance just within the SRNRA

2   alone.

3       Finally, the language used in the SRNRA visitor map does not compel a finding that

4   the Forest Service had an established policy of signing or gating any road that was not a

5   designated road.  As explained above, plaintiffs claim that the SRNRA map does not

6   provide a "clear definition" of what is a "designated" route, that it says nothing about

7   "system" vs. "non-system" roads, and that it explicitly states that "all unimproved roads are

8   open to use unless otherwise signed or gated."  Plaintiffs also contend that the OHV

9   brochure published by the Six Rivers National Forest "repeats the promise" that "routes

10  which will be under restriction will be either gated or marked with signs."[10]  Plaintiffs argue

11  that these statements leave the clear impression that the public is allowed to use any

12  unimproved road unless it is otherwise signed or gated to prohibit passage.[11]

13      Plaintiffs also claim that the Forest Service was aware that the upper access and

14  lower access routes were popular "unofficial" OHV roads, and that the Union-Zaar mine

15  shaft posed a significant risk to those recreators who used those "unofficial" roads.  They

16  contend that one reasonable interpretation of the language in the SRNRA map is that the

17  Forest Service is advising the public not to "trailblaze" off existing dirt or gravel roadways.

18  They claim that this interpretation is reinforced by statements in the map such as, "The key

19  to responsible us[e] is remaining on designated roads and trails.  Do not cut switchbacks,

20  take shortcuts, or travel cross country."

21  ────────────────

22      [10]  This statement in the brochure applies to "designated" roads only.

23      [11]  Plaintiffs argue that because the Forest Service does not require the public to obtain
    and read a copy of the SRNRA map before they enter the SRNRA's public lands, the
24  government cannot claim that the public is bound by what is in the map.  They also assert that
    because other "government" maps – including USGS maps – show four-wheel access roads
25  that do not appear on the SRNRA map, the public can reasonably assume that those access
    roads are "open" unless they are closed off.

26      This argument ignores the fact that the Forest Service is required by Congress to permit
27  OHV use only on designated roads in the SRNRA, and the fact that the SRNRA clearly
    communicates in the SRNRA map which roads are designated for OHV use.  Moreover, the
28  Forest Service can and does make the map available to the public, but cannot force the public
    to read it before they enter the land.

United States District Court

For the Northern District of California

1    Plaintiffs argue that it is irrelevant "whether or not the government believed that it

2   was illegal for OHV recreators to use the access roads leading to the Union-Zaar mine

3   shaft."  Plaintiffs claim that the Forest Service did not communicate to the public that only

4   the roads that were marked as designated roads were open to the public, and that because

5   there was no such communication, the public was free to assume that all roads were

6   "open" if they were not closed.

7    The SRNRA map clearly states sport utility/four-wheel drive vehicles, trailbikes, and

8   ATVs may be used "on designated routes," and that specific routes are "designated" as

9   "Designated Off Highway Vehicle Routes" or "Designated Off Highway Vehicle

10  Routes–Motorcycles" and are marked "OHV."  The map also identifies the term

11  "unimproved roads" in the legend, and marks numerous roads on the map as "unimproved

12  roads."  It is in this context that the statement regarding OHV use on designated roads and

13  the statement that "all unimproved roads are open to use unless otherwise signed or gated"

14  must be read and understood.

15   Plaintiffs appear to be suggesting that the Forest Service should be required to gate

16  off or sign off any road it considers unsuitable for vehicle use in the Six Rivers National

17  Forest, based on statements in the SRNRA brochure and map.  But plaintiffs' interpretation

18  of those statements is based on a mischaracterization of the language.  There is simply no

19  mandatory language in those documents, much less in any regulation or statute, that

20  requires the Forest Service to mark all roads that are <u>not</u> designated for OHV use, for

21  whatever reason.

22   Plaintiffs contend that this case is similar to <u>Faber v. United States</u>, 56 F.3d 1122

23  (9th Cir. 1995), but the court finds that the facts in <u>Faber</u> are distinguishable.  The plaintiff

24  in that case was paralyzed in 1991 after diving from a twenty-foot rock ledge into a shallow

25  pool in the Coronado National Forest.  Numerous diving accidents had previously occurred

26  in the area where the plaintiff dove off the ledge, despite the presence of four warning

27  signs.  The court held that the discretionary function exception did not apply because the

28  four warning signs at the site in 1991 had all been there since before 1986, the year that

34

United States District Court

For the Northern District of California

1   the Forest Service had issued a "site management plan" that specifically required the

2   Forest to "provide a presence at the [accident site] to verbally warn the public, enforce the

3   laws, and record use patterns." Id. at 1123-26.

4        The court held that the Forest had no choice but to follow the 1986 site management

5   plan, and noted that the plan did not give the Forest the option of doing nothing in response

6   to the hazards enumerated in the plan.  Thus, because the challenged conduct of the

7   Forest Service was in direct contravention of a specifically prescribed federal function, and

8   therefore did not involve an element of judgment or choice, the court concluded that the

9   discretionary function exception did not apply.  Id.

10       In the present case, by contrast, the Forest Service was not obligated to post

11  warning signs on a trail that was not designated for OHV use.  No site management plan or

12  safety plan set forth specific mandatory actions to be taken with regard to protecting public

13  safety or warning the public about the dangers of open mine shafts.  The court finds that

14  the Ninth Circuit's decisions in Childers v. United States, 40 F.3d 973 (9th Cir. 1995);

15  Valdez v. United States, 56 F.3d 1177 (9th Cir. 1995); and Blackburn are more relevant to

16  the facts at hand.  In each of those cases, the court considered whether the failure to post

17  warnings, or failure to post a specific type of warning, was protected by the discretionary

18  function exception, and found that it was.

19       In Childers, an 11-year-old boy fell to his death in a winter hiking accident in

20  Yosemite National Park.  The trail on which he was hiking was unmaintained in the winter,

21  and no signs were posted along the trail warning of danger.  The boy's parents sued, and

22  the court held that the discretionary function exception protected decisions relating to

23  treatment of unmaintained trails in the park during the winter.  Specifically, the court found

24  that the National Park Service's decision to mark and maintain certain trails, and to not

25  mark or maintain others, was a permissible method of exercise of discretion.  Childers, 40

26  F.3d at 976.

27       The court concluded that while the Park Service was required by its safety standards

28  to either close unmaintained trails or adequately warn the public, the precise manner in

35

United States District Court

For the Northern District of California

1  which the Park Service was to warn the public was a matter of judgment or choice. Id. at

2  976-76. The court noted that no guidelines required that warnings be placed along the trail

3  itself, and that the Park Service did provide warnings through park brochures, visitor center

4  displays, bulletin board information, and personal contacts. Id. at 976.

5       In Valdez, a hiker filed suit after he was injured when he fell down the face of a

6  waterfall in Kings Canyon National Park. He alleged that the Park Service was negligent in

7  failing to warn the public of the dangers of hiking on a trail that bordered the sides of the

8  falls and crossed a stream at the top of the falls. He argued that the Park Service's policy

9  manuals demonstrated that there were mandatory regulations in place prescribing a course

10 of action for Park Service employees to follow. Relying on Childers, the court found that

11 while the policy guidelines outlined general policy goals regarding visitor safety, the means

12 by which Park Service employees met those goals necessarily involved an exercise of

13 discretion. Valdez, 56 F.3d at 1181-80.

14      In Blackburn, the plaintiff was injured when he dove off a bridge spanning the

15 Merced River, in Yosemite National Park. Ten years prior to the accident, the Park Service

16 had installed six signs at the bridge stating "Dangerous to Dive from Bridge." Nevertheless,

17 the plaintiff alleged that the Park Service was negligent in failing to adequately warn the

18 public of the dangers of diving from the bridge.

19      Relying on Childers and Valdez, the court found that the Park Service guidelines and

20 the statutes and regulations under which the Park Service operated necessarily

21 encompassed an element of discretion in deciding how and when to warn the public of

22 known dangers. Blackburn, 100 F.3d at 1431. The court also distinguished Faber on the

23 basis that the Park Service in that case had failed to comply with the requirements in the

24 site management plan, whereas no such plan controlled the area of Yosemite National

25 Park where the plaintiff dove off the bridge. Id. at 1432-33.

26      In general, where guidelines and regulations set forth general goals and policies

27 without providing specific plans or mandates – such guidelines and regulations necessarily

28 involve an element of discretion in determining the precise manner in which to meet those

United States District Court

For the Northern District of California

1    goals.  Id. at 1433.  In the present case, however, there is not even any evidence that the

2    Forest Service had issued relevant policy guidelines regarding visitor safety.  Nevertheless,

3    in the absence of any specific mandatory laws, regulations, or policies, the Forest Service's

4    decisions regarding how to mark roads and trails and how to warn of hazards certainly

5    involved the exercise of discretion.

6            2.       The Element of Policy Judgment

7            Having determined that the decision whether to install fencing and warning signs,

8    and whether to monitor the site was discretionary, the court must next consider whether the

9    judgment of the Forest Service was "of the kind that the discretionary function exception

10   was designed to shield."  Gaubert, 499 U.S. at 322-23 (quotation and citation omitted).  The

11   exception "protects only governmental actions and decisions based on consideration of

12   public policy."  Id.

13           The United States asserts that the Forest Service is required to balance a variety of

14   policy considerations in deciding how to identify possible hazards on its vast lands, and

15   whether to place signs on roads, or barricade them.  Such policy considerations implicate

16   concerns about the environment and wildlife, public access and safety, likelihood of injury,

17   resource allocation, topography, private property constraints, and the effectiveness of

18   available measures, and require the Forest Service to balance the costs and benefits of

19   identifying hazards and installing barricades and signs.

20           The United States compares the facts of the present case to those in Soldano v.

21   United States, 453 F.3d 1140 (9th Cir. 2006).  In that case, the plaintiff was severely injured

22   when he drove his motorcycle around a bend in a road in Yosemite National Park; swerved

23   to avoid a van that was stopped in his lane, waiting to turn left; and ran head-on into

24   another van.  The plaintiff was driving within the posted speed of 35 m.p.h., but the "Park

25   Road Standards" permitted a 35 m.p.h. speed limit only where road visibility met or

26   exceeded 225 feet.

27           The court ruled that the discretionary function exception barred the claim that the

28   Park Service had negligently designed the road by failing to post warning signs at the site

37

United States District Court

For the Northern District of California

1   of the accident (although it did not bar the claim that the Park Service negligently set the

2   speed limit too high relative to the road's design).  Id. at 1147.  The court found that the

3   placement of signs was governed by Park Service policies, particularly those set forth in the

4   National Park Service Sign Manual.  The Sign Manual delineated a number of factors that

5   Park managers should consider in determining whether to place signs, but left decisions

6   regarding the placement and use of signs to the Park manager's discretion.

7       Thus, the court concluded, decisions regarding the placement of signs at particular

8   locations were not mandated; and the Park Service had to balance "a panoply of social,

9   economic, and political considerations applicable to the distinctive nature of park roads"

10  when determining whether to design a road with a particular given sign at a particular

11  location.  Id. at 1148.  Because deciding whether to warn of the potential danger of stopped

12  traffic at the site of the plaintiff's accident was a judgment "of the kind that the discretionary

13  function exception was designed to shield," the court found that the sign placement claim

14  was barred by the discretionary function exception.  Id.

15      The United States cites additional cases in which the Ninth Circuit has applied the

16  discretionary function exception and has found that the decision to warn or not to warn in

17  recreational areas implicated competing policies and interests, including Childers and

18  Valdez, the facts of which are discussed above, and Reed v. U.S. Dep't of the Interior, 231

19  F.3d 501 (9th Cir. 2000).

20      In Childers, the court found that the National Park Service's decision not to post

21  warning signs or close the trail was the result of a discretionary balancing of the competing

22  policy concerns in, for example, 16 U.S.C. § 1 (requiring the Park Service to balance

23  preservation and public access), and the Yellowstone Ranger Operating Procedure

24  (requiring park personnel to weigh public access against visitor safety).  Childers, 40 F.3d

25  at 974-76.  The court concluded that the Park Service had to balance access with safety,

26  and also take into account conservation and resources in designing area plans and making

27  individual trail determinations.  Id.

28      In Valdez, the court found that the guidelines and policies of the National Park

United States District Court

For the Northern District of California

1   Service simply outlined general policy goals regarding visitor safety.  However, the

2   guidelines' mandate to warn the public of "special hazards" through educational materials,

3   brochures, pamphlets, and the like necessarily encompassed an element of discretion in

4   identifying such hazards, and an element of judgment in determining which hazards

5   required an explicit warning.  Valdez, 56 F.3d at 1180.

6       The court also found that safety management concerns in the Park were based on

7   considerations of public policy – requiring a choice between the competing policy

8   considerations of maximizing access to and preservation of natural resources verses the

9   need to minimize potential safety hazards.  Id.  Similarly, the decision regarding which

10  natural hazards should be brought to the attention of the public through pamphlets or

11  brochures – in light of the Park Service's limited resources and the unlimited list of potential

12  natural hazards – required the Park Service to balance public safety against competing

13  fiscal concerns in deciding which dangers were obvious and which merited the special

14  focus of a warning brochure.  Id.

15      In Reed, the plaintiff was run over by a motor vehicle while he was sleeping in his

16  tent at the Burning Man Festival.  The Festival was held at the Black Rock Desert in

17  northwestern Nevada, on federally-owned land managed by the Bureau of Land

18  Management.  The plaintiff argued that the BLM's failure to warn of the hazard of camping

19  in an area subject to restricted night-time vehicular travel and the BLM's approval of a site

20  plan that failed to segregate cars from tents were not protected by the discretionary

21  function exception.  The BLM's land use plan in effect at the time required the BLM to

22  provide "as many recreational opportunities as possible . . . without undue environmental

23  degradation."

24      The court held that the discretionary function applied because the BLM's decision to

25  issue the event permit involved discretion in balancing "competing public policy concerns,

26  including concerns about public access, safety, resource allocation, and the environment."

27  Reed, 231 F.3d at 505.  The court also held that decisions regarding the monitoring of the

28  event were discretionary and required a balancing of public policy concerns, including

39

United States District Court

For the Northern District of California

1    consideration of "the resource values at risk, the permittee's past record of compliance,

2    [and] the ability to obtain monitoring through other means such as local police, other

3    permittees, and other factors."  Id. at 506.

4    Here, just as in Soldano, Childers, Vasquez, and Reed, the Forest Service's

5    decisions regarding the identification, marking, monitoring, and abatement of possible

6    hazards implicated competing policy concerns, including environmental considerations,

7    public access and safety considerations, resource allocation, and the fact of the National

8    Forest's limited resources.  The Multiple-Use Sustained Yield Act of 1960, the Forest and

9    Rangeland Renewable Resource Act of 1974, and the National Forest Management Act of

10   1976 all direct Forest Service employees to consider the best and most judicious means of

11   both implementing the Service's policy priorities – which include reforestation, fire

12   prevention, preventing soil erosion, preserving wildlife – and considering the economic and

13   environmental impacts of its actions.

14   Plaintiffs assert, however, that the Forest Service's failure to "guard" the Union-Zaar

15   mine shaft after undertaking to do so was not an act of the type that Congress intended to

16   shield from tort liability because it did not involve the exercise of policy judgment.  They

17   argue that failure to properly perform a task, once undertaken, is not a permissible exercise

18   of policy judgment.  In support, they cite Indian Towing Co., Inc. v. United States, 350 U.S.

19   61 (1955).

20   In that case, a tugboat went aground and a barge was damaged, allegedly because

21   of negligent operation of a lighthouse by the U.S. Coast Guard.  The Supreme Court held

22   that because the Coast Guard had exercised its discretion to operate a lighthouse service,

23   and had "engendered reliance on the guidance offered by the light," it also had a duty to

24   use due care to make sure that the lighthouse was kept in good working order, and to use

25   due care to discover failure of the light and to repair it or give warning if it was not

26   functioning.  Id. at 69-70.

27   Plaintiffs contend that this principle was affirmed in Berkovitz.  In that case, the

28   plaintiff contracted polio after taking the oral polio vaccine, and sued the United States for

40

**United States District Court**
For the Northern District of California

approving the vaccine.  The Supreme Court held that the discretionary function exception did not apply, because the government had no discretion to license the vaccine without having first received the required safety data.  In a footnote, the Court cited Indian Towing, which it asserted "illuminates the appropriate scope of the discretionary function exception." Berkovitz, 486 U.S. at 538 n.3.  The Court noted that in that case, while the initial decision to operate the lighthouse was discretionary, the government's failure to maintain the lighthouse in good condition did not involve any permissible exercise of policy judgment. Id.[12]

Plaintiffs assert that the Ninth Circuit has generally held that the implementation of a chosen course of action is not shielded by the discretionary function exception, citing ARA Leisure Servs. v. United States, 831 F.2d 193 (9th Cir. 1987); Seyler v. United States, 832 F.2d 120 (9th Cir. 1987); Camozzi v. Roland/Miller & Hope Consulting Group, 866 F.2d 287, 290 (9th Cir. 1989); Summers v. United States, 905 F.2d 1212 (9th Cir. 1990); Marlys Bear Medicine v. United States, 241 F.3d 1208 (9th Cir. 2001); and Soldano v. United States.

In ARA Leisure Services, a tour bus company was sued by its passengers when one of its buses went off the road in Denali National Park, and several passengers were killed or injured.  The accident occurred on a badly eroded stretch of park road.  The bus company brought an action for contribution against the federal government, claiming that the National Park Service had negligently designed, constructed, and maintained the road.

The court found that while the Park Service's decision to design and construct the road without guardrails was grounded in social and political policy, the failure to maintain the road in a safe condition was not a protected decision, as it involved "safety considerations under an established policy" – specifically, Park Service standards regarding maintenance of graded park roads – rather than the balancing of competing

---

[12]  As the Ninth Circuit noted in Kennewick, however, the decision in Indian Towing did not actually involve the discretionary function exception, despite the statement in Berkovitz. See Kennewick, 880 F.2d at 1024.

United States District Court

For the Northern District of California

public policy considerations.  ARA Leisure Servs., 831 F.2d at 195.

The court also ruled that it is not enough for the government to show that some choice was involved in the decisionmaking process; the balancing of policy considerations is a necessary prerequisite.  Id. (citation and quotation omitted).  The court concluded that the Park Service had balanced the relevant policy considerations when it established its standards for graded roads, and that the allocation of funds among projects aimed at bringing the roads up to the Park Service standards was not a decision "of the nature and quality that Congress intended to shield from tort liability."  Id. at 196 (citation and quotation omitted).

In Seyler, the plaintiff was injured while riding as a passenger on a friend's motorcycle.  The motorcycle failed to negotiate a turn on a 2-lane, paved, public highway maintained by the Bureau of Indian Affairs.  The plaintiff asserted that the BIA was negligent in failing to erect speed limit signs on the road.

The court found nothing in the record to suggest that the BIA's failure to provide signs resulted from a decision "grounded in social, economic, or political policy."  The court also doubted that the decision not to provide adequate signs would be "of the nature and quality that Congress intended to shield from tort liability, adding that "[t]he same may be said for at least some other kinds of maintenance decisions."  Seyler, 832 F.2d at 123 (citing ARA Leisure Servs., 831 F.2d at 193).

In Camozzi, two cement masons employed by a general contractor who was constructing a United States Post Office in Petaluma, California, fell through an unguarded opening in metal decking, and sued the USPS for negligence.

The USPS had contracted with Roland/Miller Associates and Hope Consulting Group ("Roland/Miller") to supervise the construction, and Roland/Miller contracted with Roebbelen Construction Co. ("Roebbelen") to serve as general contractor.  The USPS' contract with Roebbelen provided that Roebbelen was required to take proper precautions to protect the health and safety of the workers and the public, although the USPS retained responsibility for overseeing compliance with safety precautions, and contracted with

42

United States District Court

For the Northern District of California

1   Roland/Miller to discharge that responsibility.

2       The plaintiffs argued that their injuries arose from the alleged negligence of USPS in

3   discharging its authority to police Roebbelen's compliance with safety standards, directly or

4   through Roland/Miller.  The United States asserted that in delegating its responsibility for

5   worker safety to Roebbelen, USPS had exercised a discretionary function excepted from

6   the FTCA.

7       The court held that the failure to inspect floors for uncovered and unguarded

8   openings was not the result of a policy choice by the particular employees or agents

9   involved, but rather was a simple failure to effectuate policy choices already made and

10  incorporated in the contracts.  Camozzi, 866 F.2d at 289-90.

11      In Summers, a four-year-old child visited Rodeo Beach, part of the Golden Gate

12  National Recreation Area, with her parents.  She stepped on a rock that was part of a fire

13  ring, lost her balance, and burned her foot on hot embers inside the fire ring.  The beach

14  was subject to National Park Service and Department of Interior Regulations regarding

15  visitor safety, the purpose of which was to protect visitors from recognized natural and

16  man-made hazards within the park boundaries.  The safety program included a

17  requirement for annual inspections of facilities, and a requirement that identified hazards be

18  addressed as soon as they were identified, as well as guidelines that mandated the

19  formation of "safety committees" to identify and deal with hazards in their areas.

20      Although the Park Service had posted signs warning that fires were permitted only in

21  the fire rings, it had posted no signs warning of the dangers to barefoot visitors of stepping

22  on hot coals within the fire rings.  The court found that because the Park Rangers had not

23  previously identified the danger of stepping on hot coals as a serious safety injury prior to

24  the plaintiff's injury, the Park Service's failure to warn of that particular danger did not

25  contravene a prescriptive federal statute, regulations, or policy.  The court found further

26  that the decision to place warning signs was an exercise of discretionary judgment.

27  Summers, 905 F.2d at 1214-15.

28      However, the court also found no evidence that the failure to post warnings of the

43

United States District Court
For the Northern District of California

1   danger of stepping on hot coals was the result of a decision reflecting the competing

2   considerations of the Park Service's sign policy.  The court cited <u>ARA Leisure Services</u> for

3   the proposition that "where the challenged governmental activity involves safety

4   considerations under an established policy, rather than the balancing of competing policy

5   considerations, the rationale for the [discretionary function] exception falls away and the

6   U.S. will be responsible for the negligence of its employees."  <u>Id.</u> at 1215 (quoting <u>ARA</u>

7   <u>Leisure Servs.</u>, 831 F.2d at 195).

8         In <u>Bear Medicine</u>, Leland Kicking Woman, a member of the Blackfeet Tribe, was

9   injured when a tree fell on him while he was working for a private logging operation on the

10  Blackfeet Indian Reservation, pursuant to a Bureau of Indian Affairs contract.  After Kicking

11  Woman died from his injuries, his descendants filed suit alleging that the BIA was negligent

12  in authorizing the contract; in failing to adequately inspect and manage the logging site; and

13  in failing to ensure that appropriate safety measures were taken.

14        The court held that the discretionary function exception barred the claim that the BIA

15  had negligently authorized the contract.  <u>Bear Medicine</u>, 241 F.3d at 1214.  The court held

16  further, however, that while the BIA may have had discretion in its monitoring of the logging

17  operation, its actions in carrying out its responsibilities were not protected policy judgments

18  and therefore did not satisfy the second prong of the two-part test. The court noted that it

19  has generally held that "once the [g]overnment has undertaken responsibility for the safety

20  of a project, the execution of that responsibility is not subject to the discretionary function

21  exception," as "[t]he decision to adopt safety precautions may be based in policy

22  considerations, but the implementation of those precautions is not."  <u>Id.</u> at 1215.

23        The court observed that it would be improper for the government to claim both that

24  the decision to take safety measures and that the implementation of those measures were

25  protected policy decisions, as this "would essentially allow the [g]overnment to

26  administratively immunize itself from tort liability under applicable state law as a matter of

27  'policy.'"  <u>Id.</u> at (citation and quotation omitted).

28        In <u>Soldano</u>, as detailed above, the plaintiff was injured in Yosemite National Park

United States District Court
For the Northern District of California

1    when he drove around a blind curve in his motorcycle and crashed into an on-coming van.

2    The court found that the discretionary function exception barred the plaintiff's claim that the

3    Park Service negligently designed the road by failing to install warning signs, because the

4    decision to utilize a particular sign at a particular location was discretionary and the product

5    of social, economic, and political policy considerations.  Soldano, 453 F.3d at 1147-48.

6    However, the court found that the discretionary function exception did not bar the

7    claim that the Park Service negligently designed the road by failing to set a safe speed limit

8    for the road as designed, because setting speed limits is "essentially a matter of scientific

9    and professional judgment, and 'matters of scientific and professional judgment –

10    particularly judgments concerning safety – are rarely considered to be susceptible to social,

11    economic, or political policy.'"  Id. at 1148 (citing Whisnant, 400 F.3d at 1183).

12    Moreover, the court noted, the 1984 Park Road Standards specified appropriate

13    speed limits for particular conditions, and allowed a 35 m.p.h. speed limit only where the

14    "stopping-sight distance" was at least 225 feet – not the case at the accident site.  Thus,

15    the element of choice involved in the Park Service's decision not to implement a speed limit

16    in accordance with the Standards' safety guidelines resembled more "a departure from

17    safety considerations" and less "a mistaken judgment in a matter clearly involving choices

18    among political, economic, and social factors."  Id. at 1148-49 (citations and quotations

19    omitted).

20    Based on the above decisions, plaintiffs assert that in this case, the court should

21    decline to find the discretionary function exception applicable, because the Forest Service's

22    decisions involved safety considerations under an established policy rather than the

23    balancing of competing public policy considerations.  They contend that the Ninth Circuit

24    has emphasized that the United States cannot claim that both the failure to take safety

25    measures and the negligent implementation of those measures are protected policy

26    decisions, and that safety measures, once undertaken, cannot be shortchanged in the

27    name of policy.

28    Plaintiffs assert that the Forest Service undertook to protect and warn the public

**United States District Court**
For the Northern District of California

1   about the danger posed by the Union-Zaar mine shaft, by establishing a policy at the

2   Washington Level, requiring all National Forests to erect and maintain warning signs at all

3   abandoned mine features which posed a hazard to the public.  They contend that the Six

4   Rivers National Forest determined that the Union-Zaar mine shaft was such a feature, and

5   erected warning signs there.

6        They argue further that the Six Rivers National Forest determined that the Union-

7   Zaar mine shaft posed a substantial hazard of injury to OHV recreators, who might drive up

8   the embankment and into the shaft, thinking it was a turn-out.  They assert that having

9   undertaken to warn the public, the government is not shielded by the discretionary function

10  exception for its failure to properly do so.

11       Plaintiffs concede that the decision to install the interim fencing and warning signs at

12  the Union-Zaar mine shaft may have involved some discretion, and may have involved

13  some balancing of various considerations (cost, public safety, and available resources), but

14  argue that once the Forest Service determined that these factors weighed in favor of

15  fencing the shaft and posting a warning notice, and proceeded to take steps to do so, the

16  Forest Service's negligence in implementing that decision is not itself a "policy decision"

17  that is protected from liability.

18       The court finds that the United States has demonstrated that the determination of

19  how to identify, warn of, or monitor the potential hazard posed by the abandoned mine

20  shaft was a discretionary act that involved protected policy judgments.  The cases cited by

21  plaintiff are distinguishable, for various reasons.

22       ARA Leisure Services, Soldano, and Seyler all involved accidents that occurred on

23  roads designed and maintained by government agencies – the Park Service in ARA

24  Leisure Services and Soldano, and the BIA in Seyler.  The agencies had exercised

25  discretion in promulgating safety standards that applied on their own roads, and the court

26  simply held that the implementation of those established safety standards did not involve

27  the balancing of policy considerations.  Similarly, Carmozzi involved the application of

28  safety standards that were set forth in the contracts between the USPS and the

United States District Court

For the Northern District of California

1    construction manager and the general contractor, and <u>Bear Medicine</u> involved a contractual

2    requirement that the BIA ensure that the operation complied with OSHA and other internal

3    regulations.

4        Here, by contrast, there is no evidence that the Forest Service promulgated any

5    safety standards with regard to non-system roads or trails.  The trail on which Dale

6    Cleveland and his friends were driving on October 11, 2003, was not a road or trail built or

7    maintained by the Forest Service – and the steep embankment that was adjacent to the

8    non-system trail was not even a trail, let alone a Forest Service "designated trail."

9        In <u>Summers</u>, the court simply found no evidence that the Park Service's failure to

10   post signs warning of the danger of walking into the fire rings was the product of a

11   balancing of the competing considerations of the Service's sign policy, as there was no

12   evidence that the Park Service was aware that such a danger existed.  Moreover, the Ninth

13   Circuit subsequently commented that the analysis of the discretion test in <u>Summers</u> was

14   inconsistent with later Ninth Circuit authority in <u>Valdez</u> and <u>Childers</u>.  <u>See</u> <u>Blackburn</u>, 100

15   F.3d at 1432.

16       The Ninth Circuit has not, as plaintiffs suggest, adopted a blanket rule that all claims

17   regarding the implementation of a chosen course of action are not protected.  The cases on

18   which plaintiffs rely concern government activity involving safety considerations under

19   <u>established policies</u> – which is not the case here.  Nevertheless, while there is no evidence

20   in the present case that the Forest Service failed to comply with its own mandatory safety

21   standards, there is evidence that the decisions made by the Forest Service with regard to

22   the Union-Zaar mine site were the result of a judgment grounded in social, economic and

23   political policy, as in <u>Soldano</u>, 453 F.3d at 1146; <u>Blackburn</u>, 100 F.3d at 1433-34; <u>Valdez</u>,

24   56 F.3d at 1179-80; and <u>Childers</u>, 40 F.3d at 974-76.

25       With regard to the Forest Service's judgments concerning the necessity of

26   monitoring the mine site, this case involves facts that are similar to those in <u>U.S. v. Varig</u>

27   <u>Airlines</u>, 467 U.S. 797 (1984).  In that case, the plaintiffs alleged that the Federal Aviation

28   Administration negligently failed to inspect prototype parts before certifying two aircraft

47

United States District Court

For the Northern District of California

1    designs as safe.  Due to its limited workforce, the FAA performed its monitoring function by

2    relying on "spot checks."  The Supreme Court held that the discretionary function exception

3    applied both to the adoption of a "spot-check system" and to the specific failure to inspect

4    prototypes of the parts that ultimately failed.

5         Observing that the FAA's activities were carried out under the broad statutory

6    discretion of the Secretary of Transportation to act "according to her judgment of the best

7    course," id. at 816, the Court explained that the FAA had to balance the objectives sought

8    to be obtained against such practical considerations as staffing and funding, id. at 820.

9    The Court held that the FTCA does not confer jurisdiction to "second-guess" what

10   monitoring program "best accommodates the goal of . . . safety and the reality of finite

11   agency resources."  Id.

12        Similarly, in the present case, the activities of the Forest Service are carried out

13   under the broad discretion of the Secretary of Agriculture to determine the "best" and "most

14   judicious" means of implementing a broad range of competing policies.  16 U.S.C. § 581j.

15   As in Varig, the discretionary function exception forbids the district court from second-

16   guessing what inspection and maintenance program best accommodates the goal of

17   safety and the reality of finite resources, as there is no mandated policy for the Forest

18   Service to monitor temporary signs and fencing.

19        Five recent Ninth Circuit decisions further illustrate this distinction between

20   judgments that involve the balancing of competing public policies, and those that do not.  In

21   Whisnant, the plaintiff worked for a company that had a contract to deliver seafood

22   products to the commissary at the United States Navy's Bangor Submarine Base in

23   Silverdale, Washington.  Because of lack of proper maintenance, toxic mold accumulated in

24   the commissary's meat department.  Following his exposure to the mold, the plaintiff

25   became ill, and filed suit under the FTCA.

26        The plaintiff alleged that the Defense Commissary Agency, which operated the

27   commissary, was negligent in following through on its safety inspection procedures.  The

28   agency's regulations required periodic safety inspections, but left it to the employees to

United States District Court

For the Northern District of California

determine how and when to conduct the inspections.  The parties agreed that no statute, regulations, or policy prescribed the specific manner in which the commissary was to be inspected or a specific course of conduct for addressing mold.

The court found that the agency's duty to maintain its grocery store as a safe and healthy environment for employees and customers was not a policy choice of the type that the discretionary function exception shields, as "[c]leaning up mold involves professional and scientific judgment, not decisions of social, economic, or political policy," as "'a failure to adhere to accepted professional standards is not susceptible to a policy analysis.'" Whisnant, 400 F.3d at 1183 (citing Bear Medicine, 241 F.3d at 1217).

In Oberson v. U.S. Dep't of Agriculture, the plaintiff was severely injured in a snowmobile accident on a groomed trail managed by the Forest Service in the Gallatin National Forest.  The plaintiff alleged that the Forest Service had negligently failed to post a sign at a hill on the trail, warning snowmobile riders that the posted speed limit of 45 m.p.h. was too fast for safety at that point on the trail.  The Forest Service had previously warranted the trail at 35 m.p.h., but later raised the speed limit to 45 m.p.h. to conform to the speed limit in the adjacent Yellowstone National Park, without also warranting the trails at the higher speed limit.

The court found no evidence that the Forest Service's failure to post a warning was the result of a policy decision.  Oberson, 441 F.3d at 710-11.  The court distinguished the facts from those in Childers, Valdez, and Blackburn, on the basis that each of those cases had involved the balancing of competing policy considerations, and found the facts more similar to those in Summers, Faber, and Seyler.  Id. at 711-12.

The court found that the Forest Service knew of the hazard through its own investigation, which disclosed that sixteen days prior to the accident the hill in question had been the site of a potentially serious collision between a snow grooming machine and two snowmobiles.  The court concluded that in the absence of any evidence that the failure to post a warning or remedy the hazard was the product of a policy choice, the discretionary function exception did not shield the Forest Service from liability.  Id. at 712.

In <u>Navarette v. United States</u>, the plaintiff was injured when he fell off a cliff at night at the Liberty Glen Campground, operated by the Army Corps of Engineers near Lake Sonoma in Northern California.  The plaintiff and his friend had walked down an unmarked path from their camp site in the direction of lights visible at another campsite.  The path leading to the cliff was not part of the campground plan, but was a "use path" that had been worn down by animals and campers.  The rangers at the campground were aware of the path, but the Army Corps had done nothing to alert campers about the dangerous drop-off.

The court found that regulations requiring the Army Corps to manage resources so as to "provid[e] the public with safe and healthful recreational opportunities while protecting and enhancing these resources," and the Army Corps' Engineering Manual, which listed as a guiding principle, "maintaining health, safety, security, and comfort of the customers in all respects," were simply "general admonitions to make the campsite safe," and were not sufficiently specific to make decisions regarding the path and cliff nondiscretionary. <u>Navarette</u>, 500 F.3d at 916.

The court did find, however, that the Army Corps was not protected by the discretionary function exception, based on the specific instruction in the Corps' Lake Sonoma Safety Plan that dangerous terrain conditions, "including drop-offs," would be "properly marked or fenced." <u>Id.</u> at 917.  The court also held that no competing policy considerations came into play, because the challenged action by the Army Corps involved "safety considerations under an established policy rather than the balancing of competing public policy considerations." <u>Id.</u> at 918-19 (quoting <u>ARA Leisure Servs.</u>, 831 F.2d at 195).

In <u>Bolt v. United States</u>, 509 F.3d 1028 (9th Cir. 2007), the plaintiff was injured when she slipped and fell on ice and snow in a parking lot outside her apartment building, at Fort Wainwright in Alaska.  The court held that the decision by the U.S. Army not to remove the snow in the parking area was not discretionary under the Army's Snow Removal Policy.  <u>Id.</u> at 1032-33.  Further, the court found, it did not involve a policy judgment, in part because snow removal was a matter of routine maintenance, which involved "safety considerations under an established policy." <u>Id.</u> at 1034-35.

1    Finally, in Terbush v. United States, 516 U.S. 1125 (9th Cir. 2008), a mountain

2 climber was killed by a rockslide as he was climbing Glacier Point Apron in Yosemite

3 National Park.  His family filed suit alleging that the Park Service had negligently

4 maintained a wastewater management system on top of Glacier Point, which created a

5 dangerous condition that led to the rockfall, and had also negligently failed to warn of the

6 dangerous condition it had created.  They argued that once the Park Service had

7 undertaken to develop facilities on top of Glacier Point, it could not do so negligently, either

8 in the design, construction, or maintenance of the facilities, or in the failure to warn the

9 public of hazards.

10    The court held that decisions regarding the design and construction of the

11 wastewater facilities were discretionary, and involved the balancing of access with

12 conservation; and also held that maintenance of the wastewater management system was

13 a discretionary function, although the court could not tell from the evidence presented

14 whether the maintenance was routine (not protected) or involved policy judgments

15 (protected).  Id. at 1131-35.  With regard to the failure to warn of the rockfall hazard, the

16 court found that "[t]he entire process . . . of identifying and responding to hazards in the

17 wild implicates the . . . broader policy mandates to balance access with conservation and

18 safety," and that the discretion the Park Service had in implementing hazard warnings was

19 susceptible to policy considerations.  Id. at 1137-40.

20    Here, as in Terbush, the determination of how to identify and warn of the potential

21 hazard posed by the Union-Zaar mine shaft plainly involved balancing of competing public

22 policies, and was not controlled by safety considerations under an established policy.  Six

23 Rivers National Forest made a discretionary decision to attempt to obtain funding for a

24 permanent closure of the mine shaft.  While that request was pending, the Forest made a

25 discretionary decision to place an interim barricade/warning at the site.  Both the decision

26 to request funding for the permanent closure and the "temporary" nature of the

27 barricade/warning were products of the balancing of competing social, economic, and

28 political policies.

**United States District Court**

For the Northern District of California

When Congress first allocated funds to the Forest Service to be used for non-CERCLA cleanups and the mitigation of safety hazards in 1998, Region 5 received $50,000 to begin program and partnership development in that fiscal year.  No statute, regulation, or nationwide policy governed the allocation of those funds.  Clayton determined that the best use of the funds would be to create a statewide intergovernmental AML taskforce, with the purpose of creating a statewide AML database.  As part of this effort, Region 5 produced the "Prioritized" inventory of AML sites in 1998, and Clayton asked the Forests in Region 5 to submit proposals for projects they deemed important.

That same year, as part of this ongoing process, Six Rivers National Forest prepared an AML inventory, which identified 16 mine sites as having medium to high priority for human safety hazards.  One of these was the Union-Zaar mine site, although the Forest had yet to identify the Union-Zaar mine shaft as a feature of the mine site.  When Cross located the mine shaft in April 2001, it was as part of an attempt to investigate the 198 mine sites that were listed on the 1998 inventory.

As soon as possible, given the nature of the Forest Service funding cycle process, Cross submitted a proposal to Region 5, recommending that funding be sought for a permanent closure of the Union Zaar mine shaft in fiscal year 2004.  In February 2002, after Region 5 had gathered all the funding proposals received from Forests in the Region, the proposed projects were prioritized in an effort to determine which projects should be funded for fiscal year 2004.  After evaluating all the proposed projects, Clayton selected the Union-Zaar mine shaft closure as one to be submitted to the Washington Office for approval.

Plaintiffs claim that the Forest Service had determined that the Union-Zaar mine shaft was directly adjacent to a popular, frequently used OHV route, that the mine shaft was at the top of a short embankment that looked like a turnout, and that the shaft could not be seen from the road surface.  Plaintiffs also claim that the government specifically acknowledged the "substantial risk" of an OHV rider riding up the embankment, which would likely result in the rider falling into the mine shaft.  Plaintiffs claim that in light of these

United States District Court

For the Northern District of California

1    "facts," the Forest Service decided that it was imperative to take immediate action to guard

2    the Union-Zaar mine shaft, and did in fact take such action.

3         The evidence shows, however, that the statements that the Union-Zaar mine shaft

4    was adjacent to a popular OHV trail, that it was not readily visible, and that it was on a rise

5    that appears to be a road pullout were statements made by Cross in two documents – the

6    January 7, 2002 e-mail to Clayton, which first informed Region 5 of the existence of the

7    mine shaft and requested information about funding for a permanent closure; and the

8    January 22, 2002 proposal, seeking funding for fiscal year 2004, to address potential

9    CERCLA remediation and safety issues associated with the mine site.  The statements

10   were not official agency determinations or pronouncements.

11        It is true that Region 5 took relatively immediate action in response to Cross'

12   proposal, but that action took the form of making the discretionary determination in

13   February 2002 to seek funding from the Washington Office for work to be done on the

14   Union-Zaar mine site in fiscal year 2004.  Plaintiffs appear to be suggesting that the

15   discretionary funding proposal imposed an obligation on the Forest Service to permanently

16   close the mine shaft before the proposal had been approved, funded, or designed.

17   However, the statements that plaintiffs claim were part of a determination by the Forest

18   Service to immediately effect closure of the mine shaft were clearly not part of any decision

19   other than the decision to seek funding for the project.

20        Eight months later, in October 2002 (while the funding proposal was still pending),

21   Six Rivers National Forest made a discretionary decision to erect interim fencing and

22   warning signs at the Union-Zaar mine shaft.  In determining what type of fencing to erect,

23   the Forest Service balanced a number of competing policy considerations, including

24   environmental concerns, the cost of the project, the feasibility of closure, the time required

25   for completion, and the difficulty of getting construction equipment to the site.

26        For example, Cross states that he decided against using heavy metal post fencing

27   based in part on the fact that installing such fencing would cause greater disturbance on

28   the land, which in turn would have required a higher level of environmental review and

United States District Court

For the Northern District of California

1    delays in the project. The Forest Service also attached AML warning signs to the fencing, in

2    a further effort to make the mine shaft more visible to any member of the public that might

3    come across it.

4        Contrary to plaintiffs' assertions, the Forest Service did not undertake to "guard" the

5    mine shaft; nor was there any requirement that it do so.  Cross states that the purpose of

6    erecting the interim fencing/warning was to attempt to provide notice to hikers, and possibly

7    riders of ATVs, and that it never occurred to him that anyone would try to drive up the

8    embankment in an OHV (as opposed to an ATV, which allows the driver to see ahead of

9    the vehicle as he climbs a hill).  Once the gabion fencing was installed, Cross considered

10   that his time and Forest Service resources would be better spent in continuing to

11   investigate other abandoned mine sites in the Six Rivers National Forest

12       Unlike the cases in which the Ninth Circuit has found that the government was

13   bound by a safety plan, or by regulations requiring the taking of safety measures, the

14   circumstances presented by this case clearly demonstrate that the Forest Service

15   exercised its discretion in determining how to deal with the potential hazards presented by

16   the Union-Zaar mine site, and in implementing that decision.

17   C.    Defendant's Motion for Summary Judgment on Civil Code § 846

18       The United States seeks summary judgment on its eighth affirmative defense,

19   arguing that it is immune from liability under the California Recreational Use Statute,

20   California Civil Code § 846.[13]

21       Summary judgment is appropriate when there is no genuine issue as to material

22   facts and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.

23   Material facts are those that might affect the outcome of the case.  Anderson v. Liberty

24   Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute as to a material fact is "genuine" if there

25   is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  Id.

26

27       [13] In this case, plaintiffs allege a claim under § 846, although they properly should have

28   alleged a cause of action for premises liability.  The United States pleads the exception as an
     affirmative defense.

United States District Court

For the Northern District of California

1    A party seeking summary judgment bears the initial burden of informing the court of

2   the basis for its motion, and of identifying those portions of the pleadings and discovery

3   responses that demonstrate the absence of a genuine issue of material fact.  Celotex Corp.

4   v. Catrett, 477 U.S. 317, 323 (1986).  Where the moving party will have the burden of proof

5   at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other

6   than for the moving party.  Southern Calif. Gas. Co. v. City of Santa Ana, 336 F.3d 885,

7   888 (9th Cir. 2003).

8    On an issue where the nonmoving party will bear the burden of proof at trial, the

9   moving party can prevail merely by pointing out to the district court that there is an absence

10   of evidence to support the nonmoving party's case.  Celotex, 477 U.S. at 324-25.  If the

11   moving party meets its initial burden, the opposing party must then set forth specific facts

12   showing that there is some genuine issue for trial in order to defeat the motion.  See Fed.

13   R. Civ. P. 56(e); Anderson, 477 U.S. at 250.

14    California law imposes a duty on people, including landowners, to use reasonable

15   care under the circumstances to prevent injury to others.  See, e.g., Alcaraz v. Vece, 14

16   Cal. 4th 1149, 1156 (1997).  California's Recreational Use statute alters this general rule by

17   immunizing landowners from liability for injuries suffered by people who use their land for

18   recreational purposes.  Avila v. Citrus Community College Dist., 38 Cal. 4th 148, 156

19   (2006).

20    The final paragraph of § 846 sets forth three exceptions to the general rule, one of

21   which is potentially applicable here.  Landowners are not shielded from liability for injuries

22   suffered by recreational users of their land where the landowner demonstrates "willful or

23   malicious failure to guard or warn against a dangerous condition, use, structure or activity."

24   Cal. Civ. Code. § 846.  The Recreational Use statute applies to land owned by the United

25   States, and the United States is entitled to rely on § 846 as a defense to actions brought

26   against it for injuries occurring on land owned by the federal government.  Mattice v. United

27   States, 969 F.2d 818, 820-21 (9th Cir.1992); Termini v. United States, 963 F.2d 1264,

28   1265-66 (9th Cir. 1992).

United States District Court
For the Northern District of California

1  Because there is no dispute that Dale and Tyson Cleveland entered the SRNRA for

2  recreational purposes, the only way plaintiffs can prevail against the United States

3  (assuming the discretionary function exception to the FTCA does not apply) is if the "willful

4  and malicious failure to warn" exception in Civil Code § 846 applies to the government's

5  conduct in this case.  Willful or malicious conduct is not presumed.  The plaintiffs bear the

6  burden of "specify[ing] the particular acts upon which the willful misconduct of the person is

7  charged."  Charpentier v. Von Geldern, 191 Cal. App. 3d 101, 114 (1987).

8  Under California law, willful misconduct is "any intentional act of an unreasonable

9  character undertaken in disregard of a known risk or a risk so obvious that the actor must

10  be taken to have been aware of it, and so great as to make the harm highly probable."

11  Spires v. United States, 805 F.2d 832, 843 (9th Cir. 1986).  To establish willful misconduct,

12  a plaintiff must show that the defendant (1) had actual or constructive knowledge of the

13  peril, (2) had actual or constructive knowledge that injury was probable, as opposed to

14  possible, and (3) consciously failed to act to avoid the danger.  Id.; see also Termini, 963

15  F.2d at 1267.

16  Thus, in order to defeat the United States' motion for summary judgment, plaintiffs

17  must establish that the United States had actual or constructive knowledge of the peril

18  created by the Union-Zaar mine shaft, that the United States had actual or constructive

19  knowledge that injury was probable (not just possible), and that the United States

20  consciously failed to act to avoid the danger.  Alternatively, they must establish the

21  existence of material issues of disputed fact as to any element that they have not

22  affirmatively established.

23  There is no dispute that the Forest Service had actual knowledge of the existence of

24  the Union-Zaar mine shaft, at least as of the date of Cross' January 2002 e-mail relating his

25  discovery of the shaft and requesting information regarding submitting a proposal for

26

27

28

56

United States District Court

For the Northern District of California

1    permanent closure.[14]  The United States argues, however, that the Forest Service was not

2    aware of the particular peril to be apprehended, as it was not foreseeable that someone

3    would drive a Land Cruiser off the path, up the steep embankment, and into the shaft.

4         This argument is related to the second factor – whether the Forest Service was

5    aware that injury was a probable, as opposed to a possible, result of that peril.  The United

6    States asserts that it was not probable that someone would drive a Land Cruiser up the

7    embankment and into the mine shaft.  The evidence shows that Cross sought funding for

8    the closure of the mine shaft because he believed that injury was possible to pedestrians

9    investigating the area, or to riders of four-wheel ATVs, but that he did not believe that the

10   mine shaft posed a danger to individuals in cars or trucks – primarily because he did not

11   believe that any car or truck could make it up the steep incline to the mine shaft.  Similarly,

12   the evidence shows that Zangger believed that pedestrians faced a possible risk of

13   inadvertently falling into the shaft, but did not consider that it posed a risk to vehicles.

14        The United States also contends that the Forest Service was aware of no prior

15   accidents in the SRNRA involving abandoned mine features in general or the Union-Zaar

16   mine shaft in particular.  While conceding that lack of prior incidents is not dispositive of the

17   issue of willfulness, the United States argues that a lack of prior accidents cuts strongly

18   against any triable issue of fact on the question of willfulness.

19        Plaintiffs argue that the evidence shows that the Forest Service had actual or

20   constructive knowledge that injury was a probable – not just a possible – result of the peril

21   posed by the mine shaft.  They assert, based on the statements in Cross' February 2002

22   application for funding, that the Forest Service knew that the mine shaft posed the highest

23   danger of all the mine structures observed, being extremely deep and wide, and located

24   next to a "popular off-highway vehicle road" from which the shaft was not readily visible.

25        Plaintiffs claim that the Forest Service was aware that the mine shaft was "easily

26   _____

27        [14]  There is some evidence that the Forest Service had been aware of the mine shaft
     in the early 1980s, and had directed the former operator of the mine to erect a fence around
28   the shaft.  There is no evidence, however, that any Forest Service employee had knowledge
     of the mine shaft as of the time of the 1991 and 1998 mine surveys.

United States District Court

For the Northern District of California

1   accessible to the public" and was on a rise that appeared to be a road pullout from which

2   an OHV recreator could easily drive into the shaft, again referring to the statements in the

3   funding proposal submitted by Cross to Region 5 in February 2002.  In addition, they note

4   that Cross included with his funding request a copy of an article about a boy who fell 200

5   feet down an abandoned mine somewhere in the State of California (though not in the

6   SRNRA).

7       Plaintiffs argue that their position is supported by the Ninth Circuit's decision in

8   Termini.  In that case, the plaintiff was driving on a single-lane, unpaved Forest Service-

9   maintained road in the Angeles National Forest when he reached a fork in the road.  Both

10  branches of the road appeared to go on for some distance and looked essentially the

11  same.  The Forest Service had graded both branches, and had posted no signs indicating

12  that one of them was a through road, while the other was a dead end.  The plaintiff took the

13  left side of the fork.  The route he chose was in fact a spur that ended at a steep cliff.  The

14  plaintiff did not see that the spur ended in a cliff until he reached the crest of the hill, at

15  which point the brakes failed, allowing the car to roll over the cliff.

16      The Forest Service argued that it could not be liable under the Recreational Use

17  Statute as it had no reason to suspect that someone would drive over the cliff, which was

18  clearly visible from the crest of the hill.  The plaintiff contended that the "willful and

19  malicious failure to warn" exception applied to the Forest Service's actions in building and

20  maintaining a road that led directly to a cliff.  Termini, 963 F.2d at 1266-67.

21      The Ninth Circuit held that the Forest Service had actual or constructive knowledge

22  that a precipice at the end of a road constitutes a peril, and also found that a reasonable

23  person standing in the shoes of the government would have recognized the probability of

24  an accident occurring on a spur road, which it had built and maintained, as a result of the

25  fact that the road led directly and without warning to the cliff's edge.  Id. at 1267-68.

26      Similarly, plaintiffs claim, the facts in the present case show that the Forest Service

27  knew or reasonably should have recognized the probability of an accident eventually

28  occurring, with injurious results, at the Union-Zaar mine shaft, as it was not properly

United States District Court

For the Northern District of California

1   guarded and signs were not properly posted and maintained.  Plaintiffs contend that the

2   government's argument that it could not have known an accident would occur at the mine

3   shaft because no accident had previously occurred there is unpersuasive, noting that the

4   Ninth Circuit rejected a similar argument in Termini.

5          Finally, with regard to the third element – whether the Forest Service consciously

6   failed to act to avoid the danger – the United States contends that the Forest Service took

7   actions in the form of erecting temporary fencing and warning signs, and also was in the

8   process of funding the permanent closure of the mine shaft.  The United States asserts that

9   the fact that the fencing and warning signs may have been vandalized at some point prior

10  to the accident does not change the fact that the Forest Service did make a concerted

11  effort to warn the public of the location of the shaft, and was in the process of obtaining

12  funding for a permanent closure.

13         Plaintiffs submit, however, that the question whether the Forest Service acted with

14  conscious disregard for the possibility of avoiding the peril posed by the Union-Zaar mine

15  shaft is a disputed question of fact.  They assert that where willfulness is at issue, summary

16  judgment should be granted with caution, as questions such as intent and motive are

17  present.  They argue that numerous facts in this case would support a reasonable fact-

18  finder in concluding that the U.S. acted with conscious disregard of the peril posed by the

19  Union-Zaar mine shaft (repeating all the "facts" from the Cross funding proposal).

20         They also contend that the Forest Service demonstrated that it was aware of the

21  danger posed by the Union-Zaar mine shaft by erecting temporary fencing pending the

22  decision on the request for funding.  They claim, however, that the Forest Service used

23  inadequate methods of fencing, and made no effort to monitor the fencing, even though it

24  learned shortly after the fencing was erected that similar fencing erected at another location

25  at approximately the same time was no longer in place.  They also assert that the Forest

26  Service made "no effort" to block off the access to the two roads leading to the mine shaft,

27  and did not clearly communicate to the public that these roads were non-system roads over

28  which it did not exercise any maintenance.

United States District Court

For the Northern District of California

1    The court finds that plaintiffs have not established that the Forest Service acted

2   willfully or maliciously in connection with its actions or omissions as to the Union-Zaar mine

3   shaft.  First, with regard to the question of the peril to be apprehended, while the Forest

4   Service was undoubtably aware of the existence of the Union-Zaar mine shaft, plaintiffs

5   have not established that the Forest Service viewed the mine shaft as dangerous to drivers

6   of OHVs, as opposed to hikers/pedestrians or drivers of ATVs.

7    The Forest Service took actions to warn the public (installing temporary fencing,

8   colored flags, and a warning sign), and also took actions to obtain funding to enclose the

9   shaft permanently.  However, Cross and Zangger did not intend that the interim fencing and

10   warning signs serve to prevent drivers of OHVs from driving into the mine shaft, but rather

11   wanted to provide some notice to pedestrians or drivers of ATVs of the presence of the

12   mine shaft.  Cross did not believe the shaft posed a threat to drivers of Jeeps or Land

13   Cruisers, and Zangger hoped to warn hikers against climbing up to the mine shaft, and also

14   to keep people from repelling down the inside of the shaft.

15    Officer White did not foresee that this type of accident was even possible.  He found

16   it unlikely that a reasonable person would encounter a problem at the mine shaft, as the

17   location was remote, difficult to get to, lightly used, and not the kind of place a person

18   would just stumble into.  It was not near a campground or on flat ground, and the land was

19   thickly vegetated everywhere except next to the embankment.  Moreover, there was no

20   indication that it was the kind of place anyone would take a motor vehicle, and he was

21   unaware of any prior mine-related accidents anywhere in the SRNRA.

22    Plaintiff has not established that triable issues exist with regard to whether the

23   Forest Service had actual or constructive knowledge that the injury was probable, as

24   opposed to simply possible.  Plaintiffs rely primarily on statements in the February 2002

25   funding application submitted by Cross – that the mine shaft was next to a road used by

26   OHVs, that the shaft could not be seen from the road, that the dirt embankment looked like

27   a vehicle turn-out, and that if a vehicle drove up the embankment, it might fall into the shaft.

28   Plaintiffs attempt to compare these observations about a non-designated, non-system

United States District Court

For the Northern District of California

1  route, made by a Forest Service employee in a proposal to obtain funding to close the mine

2  shaft, to the situation in <u>Termini</u> where the Forest Service designed and maintained a

3  system road that led to a cliff.

4       The court finds, however, that <u>Termini</u> is not controlling, as the court found there that

5  the Forest Service had deliberately designed and maintained a road that led to a cliff, and

6  had then failed to erect a sign indicating which branch of the road represented a

7  continuation of the main road, or a sign warning drivers of the cliff at the end of the other

8  branch.  <u>Termini</u>, 963 F.2d at 1268-69.  The present action does not involve an NFS road,

9  as to which the Forest Service failed to warn the public of concealed hazards.

10       The dirt and gravel trail at issue here, which was an old mining trail located in an

11  area riddled with old mines and old mining roads, was not a road designed by the Forest

12  Service, maintained by the Forest Service, or designated by the Forest Service for any type

13  of vehicle use, including OHV use.  Moreover, Dale Cleveland's vehicle was not even

14  traveling on the dirt and gravel trail when the accident occurred, but had climbed 20 feet up

15  the steep embankment that bordered the trail.

16       Finally, there is no evidence that the Forest Service "consciously disregarded" the

17  necessity to protect the public.  Indeed, the evidence shows that the Forest Service took a

18  number of actions – installing warning signs and gabion fencing around the shaft; issuing

19  maps and brochures at the Ranger Station that showed this area to be <u>not</u> designated for

20  OHV use; advising the public (including Dale Cleveland) as to the rules regarding where

21  they could and could not drive OHVs; and seeking and obtaining funding for a permanent

22  closure of the shaft.

23       The court finds, based on plaintiffs' failure to establish that the Forest Service knew

24  that injury was probable, as opposed to possible, and that the Forest Service consciously

25  failed to act to avoid the danger, that the United States' motion for summary judgment must

26  be GRANTED.

27  D.     Objections to Evidence

28       1.     Plaintiffs' Objections to Evidence

United States District Court

For the Northern District of California

1    Plaintiffs filed numerous objections to the declarations of Curtis Cross, Thomas

2    Buchta, Dale R. Somers, Rick P. Barry, and Janine Clayton.  In general, plaintiffs assert

3    lack of personal knowledge and lack of foundation, inadmissible hearsay, inadmissible

4    expert opinion, sham declaration, and lack of relevance.  To the extent that the court has

5    relied on the challenged statements by these declarants, the objections are OVERRULED.

6              a.    Curtis Cross

7    Plaintiffs make 33 objections to statements in the first Cross declaration, and 48

8    objections to statements in the second Cross declaration.  All of the objections cite more

9    than one basis.

10    Objections Nos. 1, 5-18, and 19-32 to the first Cross declaration and Nos. 1-16 and

11    18-43 to the second Cross declaration assert lack of foundation and lack of personal

12    knowledge.  Plaintiffs claim that Cross lacks personal knowledge of the matters as to which

13    he testifies, either because the testimony concerns knowledge that predated his

14    employment, concerns knowledge obtained from another employee, or concerns

15    knowledge obtained within the scope of the declarant's duties.

16    Cross states that his declarations are made based on knowledge and experience

17    gained through his employment with the Forest Service.  The declarations set forth his

18    educational background and work experience, and describe his duties and responsibilities

19    as a Forest Service employee, and his knowledge of Forest Service policies and

20    procedures.  The court finds that Cross has established that he has the requisite personal

21    knowledge to state the facts asserted, including historical facts, and that he has set forth

22    sufficient information to support those facts.

23    Objections Nos. 1-32 to the first Cross declaration and 1-16, 18-36, and 38-43 to the

24    second Cross declaration assert that the challenged statements are inadmissible hearsay.

25    Because many of the objections are vaguely described, referring only to the possibility that

26    Cross may have relied "upon what others have told him or what he has read," the court

27    cannot clearly ascertain the basis of the objections.

28    A number of the challenged statements simply set forth the steps Cross took to learn

1   about  the Forest Service's funding process, and detail his understanding of the AML

2   funding program.  Those statements, standing alone, are not being asserted to prove the

3   truth of the matter asserted.  Subsequent to learning about the process, Cross personally

4   participated in it.  Moreover, many of Cross' statements regarding that process overlap with

5   statements by other Forest Service employees, such as Clayton and Buchta.

6        To the extent that Cross relied on any Forest Service records and documents,

7   including the surveys of abandoned mines in the Smith River National Forest, that use falls

8   within the business records exception to the hearsay rule.  The reports and records were

9   made by a person with knowledge, or with information transmitted from a person with

10   knowledge, during the course of regularly conducted business activities, and were kept in

11   the regular course of business.  See Fed. R. Evid. 803(6).

12        Objection Nos. 8-10, 12-17, 20, 22, 24, and 31 to the first Cross declaration and

13   Nos. 1-16, 18-38, and 42-43 to the second Cross declaration assert that the challenged

14   statements constitute inadmissible opinion by an undisclosed expert.  Many of the

15   challenged statements are statements of facts of which Cross has personal knowledge.

16   Lay witnesses are permitted to testify as to opinions or inferences to the extent they are

17   rationally based on the perception of the witness; are helpful to a clear understanding of the

18   witness' testimony or the determination of a fact in issue; and are not based on scientific,

19   technical, or other specialized knowledge within the scope of Federal Rule of Evidence

20   702.  See Fed. R. Evid. 701.  For example, Cross' statements regarding the routes

21   designated for OHV use in the SRNRA are based on his personal knowledge, acquired as

22   part of his Forest Service duties.

23        Other statements concern matters of which the court may take judicial notice.  See

24   Fed. R. Evid. 201.  For example, the court may take judicial notice of the applicable

25   statutes and regulations, as well as of the contents of Forest Service documents such as

26   the Land and Resource Management Plan for the Six Rivers National Forest, and the

27   Forest Service Manual and Forest Service Handbooks.

28        Objection Nos. 24, 25, 27, 31, and 33 to the first Cross declaration and No. 42 to the

United States District Court

For the Northern District of California

1    second Cross declaration assert that these statements constitute "sham declarations" or

2    statements that are contradicted by other testimony.  Of these six objections, only three

3    (Nos. 31, 33, and 42) specify the previous testimony that allegedly contradicts the

4    statements in the declarations.  The court finds, however, that there is no contradiction

5    between the statements and the prior testimony.

6         Nos. 31 and 33 object to Cross' statements concerning his judgment as to the

7    necessity and/or advisability of monitoring the Union-Zaar mine shaft after the interim

8    fencing and warning signs were installed.  The cited testimony does not contradict those

9    statements, as it does not involve the same aspect of the decision.  No. 42 objects to

10   Cross' statements that given the knowledge and experience he has today, he would not

11   say, as he did in January/February 2002 (with less than a year's experience as AML

12   Coordinator), that the Union-Zaar mine shaft was "near popular OHV trails," as the upper

13   and lower access routes are not designated by the Forest Service as OHV routes.  The

14   cited testimony does not contradict this statement, as Cross simply testified that there was

15   evidence in the area of some use by off-highway vehicles.

16        Objection Nos. 17, 19-24, 26, 31, 35, 39, 40 to the second Cross declaration assert

17   that the Best Evidence Rule applies to citation to the SRNRA map, and documents from

18   Cal Nickel regarding its former operations at the Union-Zaar mine.  The court has not relied

19   on Cross' interpretation of either of these documents.

20        Objection Nos. 30 to the first Cross declaration and Nos. 37, 40, 42 to the second

21   Cross declaration assert that Cross' statements concerning his belief that OHV recreators

22   often drive around gates (No. 30), concerning the physical condition of the upper access

23   route (No. 37), concerning his understanding of the Cal Nickel document(s) (No. 40), and

24   regarding his opinion today as to whether OHV use was permitted on the upper and lower

25   access routes at the time of the accident (No. 42) are irrelevant to any issues in the case.

26   The court has not relied on these statements in ruling on the motions at issue.

27              b.     Thomas Buchta

28        Plaintiffs make 12 objections to the Buchta declaration.  All of the objections cite

64

United States District Court

For the Northern District of California

1   more than one basis.  In general, plaintiffs object to the use of testimony from Buchta

2   regarding the origins and development of the USDA's CERCLA/RCRA clean-up programs,

3   the AML identification program, the allocation of funds by Congress for those programs,

4   and the prioritization process followed by the Regional Offices of the Forest Service.

5        Objections Nos. 1-12 assert lack of foundation and lack of personal knowledge.

6   Plaintiffs claim that Buchta lacks personal knowledge of the matters as to which he testifies,

7   either because the testimony concerns knowledge that predated Buchta's employment,

8   concerns knowledge obtained from another employee, or concerns knowledge obtained

9   within the scope of the declarant's duties.

10       Buchta states that his declarations are made based on knowledge and experience

11  gained through his employment with the Forest Service.  The declarations set forth his

12  professional experience, and describe his duties and responsibilities as a Forest Service

13  employee, and his knowledge of Forest Service policies and procedures.  The court finds

14  that Buchta has established that he has the requisite personal knowledge to state the facts

15  asserted, including historical facts, and that he has set forth sufficient detail to support

16  those facts.  An employee of an entity may through the course of his employment obtain

17  personal knowledge of a fact or event, even if the event took place prior to his employment.

18       Objections Nos. 1-12 also assert that the challenged statements are inadmissible

19  hearsay.  Because the objections are vaguely described, referring only to Buchta's

20  purported reliance on "information presented" to him "by others or through documentation,"

21  the court cannot clearly ascertain the basis of the objections.  Nevertheless, to the extent

22  that Buchta's statements rely on Forest Service records and documents, that use falls

23  within the business records exception to the hearsay rule.  The reports and records were

24  made by a person with knowledge, or with information transmitted from a person with

25  knowledge, during the course of regularly conducted business activities, and were kept in

26  the regular course of business.  See Fed. R. Evid. 803(6).

27       Objection No. 1 asserts that the statements constitute inadmissible opinion by an

28  undisclosed expert.  The court's response to this same objection posed by plaintiffs to the

1    Cross declarations is applicable here.

2              c.    Dale R. Somers

3         Plaintiffs make one objection to the declaration of Dale Somers, asserting lack of

4    foundation and personal knowledge, inadmissible hearsay, and inadmissible expert

5    opinion.  In ruling on the present motions, the court has not relied on the challenged

6    statement from the Somers declaration.

7              d.    Rick P. Barry

8         Plaintiffs make one objection to the declaration of Rick P. Barry, asserting lack of

9    foundation and personal knowledge, inadmissible hearsay, and inadmissible expert

10   opinion.  In ruling on the present motions, the court has not relied on the challenged

11   statement from the Barry declaration.

12             e.    Janine Clayton

13        Plaintiffs make two objections to the declaration of Janine Clayton, asserting lack of

14   foundation and personal knowledge, inadmissible hearsay, and inadmissible expert

15   opinion.  In ruling on the present motions, the court has not relied on the statement

16   challenged in Objection No. 1.  Nor did the court rely on the statement challenged in

17   Objection No. 2.  As indicated above, however, the court does take judicial notice of the

18   contents of the Forest Service's Health and Safety Code Handbook.

19        2.    The United States' Objections to Evidence

20        The United States makes objections to certain statements in the declarations of

21   Sheila Cleveland and Tyson Cleveland, asserting that they include argumentative and

22   conclusory statements regarding the February 2003 stop by Officer Steven White.  The

23   United States contends that despite the testimony of witnesses Jerry Bachman, Curtis

24   Johnson, and Tana Bachman that Officer White spoke primarily to Dale Cleveland and

25   Jerry Bachman, and possibly to Curtis Johnson, Tyler Cleveland and Sheila Cleveland now

26   claim to have detailed knowledge of the encounter.

27        Based on the lack of any testimony that Tyler Cleveland and Sheila Cleveland had

28   any interaction with Officer White, the United States asserts that the statements that Tyler

66

1   Cleveland and Sheila Cleveland recalled exactly what Officer White said on that occasion

2   are unlikely to be based on personal knowledge; and in the case of Tyler Cleveland, conflict

3   with his deposition testimony, where he claimed to have no recollection of the event.  The

4   United States notes that Jerry Bachman confirmed in his deposition that he and Dale

5   Cleveland spoke directly to Officer White, and did not mention any interactions between

6   Tyler or Sheila Cleveland and Officer White, and also objects to statements by Tyson

7   Cleveland and Sheila Cleveland in which they attribute particular motivations to Dale

8   Cleveland.

9        In general, the evidence regarding the encounter between Officer White and the

10   Clevelands is not material or determinative of the outcome of the present motions.  The

11   evidence simply constitutes background information.  The individuals involved all

12   acknowledge that the incident occurred, although there is some dispute as to what Officer

13   White actually said.  The court agrees, however, that at least some of Tyson Cleveland's

14   statements are contradicted by his deposition testimony, and that some of Sheila

15   Cleveland's statements are contradicted by statements of other witnesses.

16        3.        The United States' Objections to Plaintiffs' Requests for Judicial Notice

17        Plaintiffs ask the court to take judicial notice of seven documents, filed as Exhibits to

18   the Declaration of Michael Henderson – Exhibit 10 (copy of death certificate of Dale

19   Cleveland); 74 (copy of the Forest Service's November 2005 "Roads Analysis and Off-

20   Highway Vehicle Strategy" for the Six Rivers National Forest and SRNRA); 77 (undated

21   copy of satellite photo of Union-Zaar mine site area by Google Earth); 79 (copy of USGS

22   map of SRNRA area); 83 (copy of Six Rivers National Forest website, dated October 23,

23   2007); 85 (copy of daylight hours recorded by U.S. Naval Observatory at Crescent City, Del

24   Norte County, California, on October 11, 2003); and 123 (copy of map of High Divide area

25   of SRNRA, posted on Forest Service's website, dated January 4, 2006).

26        The United States objects to plaintiffs' requests, asserting that five of the requests

27   (Exhibits 10, 77, 79, 83, and 85) are improperly framed as requests to take judicial notice of

28   documents, rather than requests to take judicial notice of particular adjudicative facts, as

United States District Court
For the Northern District of California

1   permitted under Federal Rule of Evidence 201.

2       The United States also objects to the court taking judicial notice of Exhibits 74

3   (November 2005 "Roads Analysis"), 83 (Six Rivers National Forest website page, dated

4   October 23, 2007) and 123 (Six Rivers National Forest website page, dated January 4,

5   2006), on the basis that they are dated well after the events at issue in this case, and on

6   the further basis (as to the websites) that plaintiffs seek judicial notice of information and

7   material contained on those websites, including links to other websites.  The United States

8   asserts that these documents are not appropriate for judicial notice.

9       The United States objects to Exhibits 10 (death certificate) and 85 (map from

10  website dated January 2006) to the extent that plaintiff seeks to rely on the contents of

11  these documents as evidence, on the ground that they are not authenticated.  The United

12  States also objects to Exhibits 77 (undated and unauthenticated satellite photo), 83

13  (October 2007 website page with links to maps), and 79 (USGS map) on the ground that

14  their relevance is disputed by the parties, that neither the USGS map nor the website show

15  the designated OHV routes in the Six Rivers National Forest.

16      The objections are SUSTAINED.  As to Exhibits 10, 77, 79, 83, and 85, plaintiffs

17  have not identified the facts that it wishes to have judicially noticed.  As to Exhibits 74, 83,

18  and 123, the court will not consider maps, website pages, or other documents that post-

19  date the events at issue in this lawsuit.

20                                    **CONCLUSION**

21      In accordance with the foregoing, the court GRANTS the United States' motion to

22  dismiss for lack of subject matter jurisdiction, and alternative motion for summary judgment.

23  Plaintiffs' motion is DENIED.

24

25  **IT IS SO ORDERED.**

26  Dated: April 18, 2008                          _____

27                                                 PHYLLIS J. HAMILTON
                                                   United States District Judge
28